# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Davis*, 2012 IL App (4th) 110305

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE DAVIS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0305 |
| Filed | March 5, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's denial of defendant's 2006 petition under section 2-1401 of the Code of Civil Procedure seeking relief from his 1983 murder conviction based on newly discovered DNA evidence that excluded him as the donor of semen and blood on the bedding where the rape and murder of the victim occurred was reversed and the cause was remanded for a new trial, since defendant acted with due diligence with respect to the original action and the section 2-1401 petition itself, and the trial court abused its discretion in finding the DNA evidence was not sufficiently conclusive to undermine confidence in the outcome of the trial. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 80-CF-948; the Hon. Charles McRae Leonhard, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Jane E. Raley (argued), of Bluhm Legal Clinic, Northwestern University, of Chicago, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Aimee Sipes Johnson (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Presiding Justice Turner and Justice Appleton concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant was convicted of murder in 1983 and received an extended-term sentence of 80 years. In July 2006, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2006)) based on newly discovered deoxyribonucleic acid (DNA) evidence excluding him as the donor of semen and blood left on the bedding where the rape and murder of the victim took place. The trial court denied the petition, finding the DNA evidence would not change the result at retrial. Defendant appeals, arguing the DNA evidence entitles him to a new trial as the new evidence would probably change the result upon retrial. We agree with defendant and reverse the trial court's judgment.

¶ 2                              I. BACKGROUND

¶ 3    On August 8, 1980, three-year-old Brianna Stickle was raped and murdered in Rantoul. On August 11, 1980, defendant, Andre Davis, was charged with her murder. The five-count charging instrument included four counts alleging felony murder in that while committing the forcible felonies of rape, indecent liberties with a child, and aggravated kidnaping, defendant killed Brianna. The fifth count alleged defendant killed the child by suffocating her, knowing such acts created a strong probability of death or great bodily harm. The jury returned a general verdict of guilty. The jury could not unanimously agree defendant should be sentenced to death, and the trial court sentenced him to a term of natural life. Defendant appealed, and this court reversed the conviction and remanded for a new trial, finding reversible error occurred when the jury asked a question of the bailiff and the bailiff failed to forward it to the trial court. *People v. Davis*, 105 Ill. App. 3d 549, 561, 433 N.E.2d 1376, 1385 (1982).

¶ 4    On June 10, 1983, defendant was again convicted of murder after a new trial. Again, five charges of murder were brought against defendant, four of them felony murder charges and the fifth alleging defendant killed the victim by suffocating her, knowing such acts created

-2-

a strong probability of death or great bodily harm. Again, the jury returned a general guilty verdict, not stating under which charge defendant was convicted. On June 30, 1983, the trial court sentenced defendant to an extended term of 80 years' imprisonment. He appealed and this court affirmed his conviction. *People v. Davis*, No. 4-83-0477 (Apr. 3, 1984) (unpublished order under Supreme Court Rule 23).

¶ 5       On February 17, 2004, defendant filed a motion for DNA testing of blood and semen evidence in the case. Such testing was not available at the time of trial and on May 6, 2004, an agreed order for testing was entered. On July 27, 2005, a second agreed order for additional DNA testing was entered.

¶ 6       The DNA test results excluded defendant as the donor of any of the blood and semen evidence tested, and defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code. On February 22, 2011, the trial court denied the petition, finding the newly discovered DNA evidence "did not undermine confidence in the outcome of defendant's trial on the charge of murder." The court further held "in the context of the record that the DNA evidence is not of the conclusive character, required by the law, that would probably result in a disposition other than conviction were the murder charge to be retried."

¶ 7       This appeal followed.

¶ 8                                        II. ANALYSIS

¶ 9       Defendant appeals, contending the newly discovered DNA evidence *would* probably change the result upon retrial. The State responds that (1) defendant failed to meet the due-diligence requirements for section 2-1401 relief and (2) the DNA evidence is not conclusively exculpatory.

¶ 10                                   A. Standard of Review

¶ 11      Defendant acknowledges the usual standard of review for the denial of a section 2-1401 petition is abuse of discretion (*People v. Haynes*, 192 Ill. 2d 437, 461, 737 N.E.2d 169, 182-83 (2000)) but argues an exception should be made in this case as he contends the case was resolved based on stipulated facts and the trial court did not have to resolve factual issues or determine the credibility of witnesses. He argues *de novo* review is appropriate where the issues presented are questions of law unless the trial court judge presiding over postconviction proceedings has "special expertise or familiarity" with the original trial or sentencing which has some bearing on the disposition of the petition. See *People v. Beaman*, 229 Ill. 2d 56, 72, 890 N.E.2d 500, 509 (2008). The judge in this case was not the original trial judge and has no particular expertise or familiarity with the trial or sentencing. Defendant asserts *de novo* review is appropriate.

¶ 12      We disagree. First, the *Beaman* decision dealt with a third-stage postconviction petition and not a section 2-1401 petition. Second, although abuse of discretion is no longer the standard for all section 2-1401 petitions, it applies to this one. The only exceptions which have been found to support *de novo* review for dismissal of a section 2-1401 petition are

where (1) the petition was based on interpretation of supreme court rules (*Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 98-99, 858 N.E.2d 1, 9 (2006)) and (2) dismissal was made without a response from the State and was found to be equivalent to dismissal for failure to state a cause of action (*People v. Vincent*, 226 Ill. 2d 1, 16-17, 871 N.E.2d 17, 27-28 (2007)). Finally, the only way to determine if a section 2-1401 petition should be allowed is to weigh the evidence presented at trial in light of newly discovered evidence, and that is a factual, not a legal, determination.

¶ 13                                B. Due Diligence

¶ 14        One of the components required in a section 2-1401 petition to be successful is a showing of due diligence in filing the petition. In a section 2-1401 petition, a party must set forth specific factual allegations as to (1) the existence of a meritorious claim or defense in the original action; (2) due diligence in presenting the claim or defense to the court in the original action; and (3) due diligence in filing the section 2-1401 petition. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381, 1386 (1986).

¶ 15        The State argues defendant has not met the due-diligence requirement. The State raised this argument in the trial court and recognizes the trial court did not base its denial of defendant's petition on this basis. The State argues this court may affirm on any basis supported by the record. See *People v. Harvey*, 379 Ill. App. 3d 518, 521, 884 N.E.2d 724, 728 (2008).

¶ 16        The State contends the type of DNA technology used in this case was available and accepted in the scientific community as early as 1996 and the database of samples for comparison was available in 1999. However, defendant did not file his motion for DNA testing until 2004, and his section 2-1401 motion was not filed until 2006. While the State recognizes section 2-1401 petitions based on DNA testing under section 116-3 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/116-3 (West 2010)) are not subject to the two-year statute of limitations placed on most section 2-1401 petitions (735 ILCS 5/2-1401(c) (West 2010)), the State argues defendant offers no excuse for failing to ask for testing for the eight years between 1996 and 2004 or the five years between 1999 and 2004. The State contends this shows a lack of due diligence.

¶ 17        The State argues petitioner must demonstrate he exercised due diligence in both (1) ascertaining his rights and (2) acting upon his rights within an appropriate time frame. See *People v. Bramlett*, 347 Ill. App. 3d 468, 473, 806 N.E.2d 1251, 1255 (2004). The State notes defendant offers no explanation for waiting eight years after the particular DNA testing was available or waiting five years after the database of samples for comparison was available to file the section 2-1401 petition. Therefore, defendant did not act reasonably in waiting to file his petition. *Airoom*, 114 Ill. 2d at 222, 499 N.E.2d at 1387 (Defendant must demonstrate "under the circumstances he acted reasonably, and not negligently."). Although defendant was not subject to the two-year statute of limitations for filing a section 2-1401 petition, the State argues he was still required to demonstrate diligence in ascertaining his rights and acting upon them. *Bramlett*, 347 Ill. App. 3d at 473, 806 N.E.2d at 1255.

¶ 18        Section 2-1401(c) explicitly exempts from its two-year statute of limitations petitions

based on newly discovered DNA evidence based on the rights to DNA testing accorded in section 116-3 of the Criminal Procedure Code. 735 ILCS 5/2-1401(c) (West 2010). Section 116-3 is silent on any limitations period during which motions for DNA testing may be filed. 725 ILCS 5/116-3 (West 2010). The lack of a time limitation in section 116-3 must be read into section 2-1401 of the Code when such petitions involve DNA evidence.

¶ 19        Due-diligence requirements for section 2-1401 petitions require two types of due diligence be shown: (1) due diligence with respect to the original action; and (2) due diligence with respect to the section 2-1401 petition itself. *S.C. Vaughn Oil Co. v. Caldwell, Troutt & Alexander*, 181 Ill. 2d 489, 496, 693 N.E.2d 338, 341 (1998). First, petitioner must show failure to discover new facts *prior to entry of judgment* was the result of an excusable mistake and not a product of negligence. To meet this requirement, petitioner must demonstrate "under the circumstances he acted reasonably, and not negligently." *Airoom*, 114 Ill. 2d at 222, 449 N.E.2d at 1387. Defendant met this requirement because DNA testing was not available at the time of his trial in 1983.

¶ 20        The second due-diligence requirement of section 2-1401 involves showing the *petition itself* was filed in a timely manner. A petitioner must file the petition without undue delay after becoming aware of the factual basis for a petition. See *People ex rel. Johnson v. Payne*, 127 Ill. App. 3d 398, 402-03, 469 N.E.2d 270, 273-74 (1984). Defendant also met this requirement because his petition was filed within four months after the second set of DNA testing was completed.

¶ 21        The State argues defendant was also required to plead and show a third kind of diligence–diligence in seeking DNA testing as soon as it was scientifically feasible–and cites *Bramlett*. *Bramlett* states petitioner is under a duty to file a section 2-1401 petition as soon as the factual basis for the petition becomes apparent. *Bramlett* did not deal with a section 2-1401 petition based on newly discovered DNA evidence. The defendant in *Bramlett* did not act with due diligence. The bases for Bramlett's claims were evident long before he filed his section 2-1401 petition. However, petitioner failed to explain why he waited to mail his petition until the day the section 2-1401 statute of limitations had run. *Bramlett*, 347 Ill. App. 3d at 473-74, 806 N.E.2d at 1255-56. The court also found Bramlett's petition was based on legal issues (as opposed to newly discovered facts). *Bramlett*, 347 Ill. App. 3d at 474, 806 N.E.2d at 1256 (ineffective assistance of trial counsel and misrepresentations about future events and failure to perform a promise to do something in the future).

¶ 22        Defendant's claim is based on new facts and he filed his petition as soon as practically possible. Neither *Bramlett* nor any other Illinois case states defendant was required to show a third kind of diligence: seeking DNA testing as soon as the testing became available.

¶ 23        In *People v. Henderson*, 343 Ill. App. 3d 1108, 799 N.E.2d 682 (2003), the trial court denied a section 116-3 motion for DNA testing. This court found while DNA testing was available for 15 years before defendant requested it, section 116-3 of the Criminal Procedure Code contains no "language indicating a legislative intent to impose a time limit for filing a motion for forensic testing." *Henderson*, 343 Ill. App. 3d at 1115, 799 N.E.2d at 689. Requiring the due diligence sought by the State would negate the purpose of DNA testing. A convicted defendant could test old DNA evidence at any time pursuant to section 116-3,

but under the State's theory the results would be unavailable for use in a section 2-1401 petition if too many years had passed between the availability of the testing and the actual testing to be considered reasonable.

¶ 24    We agree with defendant's contention even if a third due-diligence requirement were present and not forfeited, defendant showed due diligence in pursuing DNA testing. The test used in this case did not become readily available until 1999 along with the comparison database. Section 116-3 did not become effective until January 1, 1998. There was a six-year gap between the time testing became available and defendant's formal request for DNA testing in 2004. However, defendant was imprisoned at a maximum-security prison, unrepresented by counsel, and indigent. This time gap does not show a lack of due diligence. Defendant did not willfully disregard the process of the court and he was not so indifferent to it he is chargeable with culpable negligence. *Cunningham v. Miller's General Insurance Co.*, 188 Ill. App. 3d 689, 694, 544 N.E.2d 441, 444 (1989). Defendant has steadfastly proclaimed his innocence since 1980 and pursued all available avenues to demonstrate his innocence for the past 31 years. He has never neglected his claim of innocence. Defendant has met all due-diligence requirements for filing a section 2-1401 petition.

¶ 25                          C. DNA Evidence Requires New Trial

¶ 26    As the trial court noted in its opinion, in Illinois, newly discovered evidence warrants a new trial when (1) it has been discovered since trial; (2) it is of such a character it could not have been discovered prior to trial by the exercise of due diligence; (3) it is material to the issue and not merely cumulative; and (4) it is of such a conclusive character it will probably change the result on retrial. *People v. Gabriel*, 398 Ill. App. 3d 332, 350, 924 N.E.2d 1133, 1150 (2010). The court found the first three requirements were proved by defendant as to the newly discovered DNA evidence, and the State does not contest the first three requirements in this appeal. The only issue for both the trial court in its ruling and this court is whether the DNA evidence is of such conclusive character it would probably change the result of a retrial. The trial court found the DNA evidence not be of such conclusive character and we find that decision to be an abuse of discretion.

¶ 27    When a section 2-1401 petition is filed and the new evidence to be considered is DNA testing results, the trial court must consider the trial evidence in light of the new DNA results to determine whether they are so conclusive as to warrant a new trial. *People v. Dodds*, 344 Ill. App. 3d 513, 523, 801 N.E.2d 63, 72 (2003). The court must also determine whether serological evidence was a significant factor at trial and whether such evidence was more likely than not to have affected the jury's determination. *Dodds*, 344 Ill. App. 3d at 523, 801 N.E.2d at 72.

¶ 28    The evidence from defendant's second trial and the DNA evidence were presented to the trial court via a stipulation between the parties. The DNA evidence establishes defendant is not the source of the serological specimens recovered from the crime scene. The evidence also establishes the identity of the source of most of those specimens: Maurice Tucker, an occupant of the house where the crime scene was located at the time of the murder and a State witness at defendant's trial. The remaining specimens were either attributed to the

victim or an unknown male.

¶ 29      At trial, the State argued semen and blood deposits on the bedding were left by the perpetrator and that perpetrator was defendant. Multiple witnesses testified to the presence of wet stains on the bedding described as either bloodstained or clear and sticky. The State presented extensive expert testimony from Federal Bureau of Investigation (FBI) Special Agent Robert Beams, of the FBI Forensic Serology Unit, suggesting defendant left his semen on the sheet. Beams testified to the technology of the day. Defendant and the victim were both type O, the most common blood group in the United States. Further, Beam determined defendant was a nonsecretor and so was the person who left stains. Only 20% of the male population could have produced the semen and defendant was within that 20%. Defendant argues the State created a false inference when it made the suggestion the semen belonged to defendant, because the DNA evidence indicates it actually belonged to Maurice Tucker. This court relied on this evidence in affirming defendant's conviction after the second trial.

¶ 30      The trial court and the State minimize the probative value of the serological evidence presented at trial by suggesting the prosecution only briefly discussed this evidence during a lengthy closing argument. This is disingenuous. The State's narrative of the crime, the theory upon which it relied throughout the trial, and closing remarks all were designed to prove defendant raped the victim and then murdered her. The serological evidence was the central physical evidence in the case supporting the State's theory. It cannot be minimized. It is now shown to be not only misleading but false. Nonetheless, the trial court found and the State argues enough "freestanding" evidence supports defendant's murder conviction even in the face of exculpatory DNA evidence. A review of that evidence shows that not to be the case.

¶ 31      The victim's stepfather, Rand Spragg, testified on the date of her death he lived next door to the residence of Sonny and Maurice Tucker where Brianna's body was found. After Brianna and her brother spilled orange juice on the kitchen floor, she was sent outside to play while Spragg cleaned up the kitchen. From the kitchen window Spragg could see Brianna sitting under a tree in the front yard of their residence. After completing the cleanup, Spragg could no longer see Brianna in the front yard. After a search of their yard and house, Spragg went next door to the Tuckers' house. It was about 6:20 p.m. on August 8, 1980.

¶ 32      Spragg knocked on the Tuckers' door and got no answer, although he thought he heard a stereo playing inside. Spragg then drove his car around the neighborhood looking for Brianna. After returning home, Rebecca Spragg, Brianna's mother, called the police to report Brianna missing. Spragg and Rebecca then saw a "young, black male" drive up to the Tuckers' house and go to the back door. The man entered the house and came back out the back. Spragg and Rebecca asked the man if they could look inside the house for Brianna. The man, later identified as Donald Douroux, went back into the house with the Spraggs. Spragg stated they looked through the house for Brianna, including the room in which her body was later found, noting the "bed clothing" and room both looked in disarray. Spragg was specifically asked whether he looked in the bathroom. He stated he did but saw nothing out of the ordinary. Rebecca looked under the bed later found to contain Brianna's body. They left the house after not locating Brianna. Douroux went back into the house to lock it up. The back door did not lock from the outside. When he exited the front door, he looked as if he

were ill and Spragg approached Douroux to offer help. Douroux told him to reenter the house and Spragg then found Brianna's body. Spragg also noted wet stains on the bedclothes which looked to be blood and mucus. Spragg touched them and found them to be sticky or tacky.

¶ 33    Lutellis (Sonny) Tucker testified the house where the body was found was his, and his brother Maurice lived with him. Maurice slept in the utility room turned bedroom where the body was found. On the day in question, Sonny stated he left home to run errands. When he returned, he saw Maurice and defendant there, drinking. Sonny knew defendant had been in the house when he left that morning. Sonny had plans to leave town and did so. Before departing, he saw defendant leave the house on foot.

¶ 34    Maurice Tucker testified he was acquainted with defendant prior to August 8, 1980. Defendant sometimes stayed at the house and left a bag of clothes there. Defendant first arrived at the house between 9 and 10 a.m. Defendant and Maurice drank and played music both inside and outside the house all day. They also picked apples from a tree to make wine. Maurice stated he left the house between 5:30 and 6 p.m., as did defendant. Maurice stated, after viewing a crime-scene photograph, the sheets on his bed in the utility room had been disturbed since he left the house and a pair of jeans on the floor had not been there when he left the house. He identified the jeans as belonging to defendant. Both Sonny and Maurice testified defendant was wearing jeans but no shirt all day as it was very hot. Maurice was dressed the same as defendant all day.

¶ 35    Donald Douroux also testified. At the time of the offense, he lived about a block and a half away from the crime scene with his girlfriend. After visiting her at her job in Champaign, Douroux returned home in the early evening. Douroux stated he went to a car wash and visited a friend (who did not testify at trial and corroborate Douroux's whereabouts) before returning home. He stated when he got to his house he saw defendant at different times either hiding under a trailer in the yard or inside his house watching television. Defendant was very drunk.

¶ 36    Douroux stated the following conversation ensued:

"Well, [defendant] asked me–Let me get it right. Andre asked me [']what kind of town that–was Rantoul–do you think that–do you think that they would really get seriously against you, or something like that, if a black person killed a white person.['] *** I was trying to figure out what he meant by what he said, so I played like I wasn't curious. So, I got around to asking him some more questions, and he said that–He finally go around to telling me that he had killed a white woman. *** He told me it was at the residence where Sonny Tucker lived. *** Well, I asked him [']what happened, how did it happen,['] and he said that the lady had came over to the house and said that she had to talk with him, and they sat on the bed in the back, and her husband came and knocked on the door, and she was trying to open the door, and he put his hand over her mouth because she was trying to make noise, I guess; I suppose something like that."

Douroux testified while defendant was talking to him he was wearing red pants and no shirt.

¶ 37    Douroux did not believe defendant and told him he was going to prove him to be a liar. Douroux called the Tucker residence and when he received no answer, he went to the house. When he got there, he saw the Spraggs in their yard looking distraught. When he saw

Rebecca Spragg, he assumed she was the woman defendant had lied about killing.

¶ 38    Douroux knocked on the front door of the Tucker house and went to the back door when he received no answer. He found the door unlocked. He called to anyone inside but received no answer. The Spraggs approached and wanted to look inside for their missing daughter. Douroux was reluctant because it was not his house but followed the Spraggs inside. They inspected the premises, did not find Brianna and exited the front door. Douroux decided to reenter the house to lock the back door. In doing so, he passed through the utility room and noticed "an object" in the middle of the bed. Douroux stated he touched the object and found the event shocking. He started trembling and exited the front door. When the Spraggs talked to him, he told Spragg to go back inside the house where Spragg found the victim's body on the bed.

¶ 39    The police arrived and Douroux told them to come to his house to speak with him. Douroux then returned to his house and told defendant "that was a little girl; that was not a woman." Douroux testified defendant responded, " [']It's a little late for that; you got to help me get away,['] and I told him [']I refuse.[']" The police then arrived and Douroux went to the police station after defendant's arrest.

¶ 40    The testimony of Rantoul police officer Arthur Wiseman was presented to the jury via transcript as he had died since the time of the trial. Wiseman was the officer who met Douroux at his house and arrested defendant. Rantoul Officer Montgomery Portis also testified. After Wiseman gave defendant *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)), Portis asked defendant if he knew why he was arrested. Defendant stated Wiseman told him he was arrested for rape but he stated he did not rape "no little white girl." Portis stated he had not mentioned a little white girl to defendant prior to that. So Portis asked defendant if he knew how old the girl was and defendant replied between five and seven. Portis asked defendant how he knew that and he replied the officer told him it was a little white girl.

¶ 41    Portis asked defendant what he had been doing all day. He said he was watching television at a friend's house when he was arrested. Defendant said he asked the officer who arrested him if he could put a shirt on and the officer said no. Defendant told Portis he wanted to put some pants on because he was only wearing shorts and they were dirty. When defendant stood up, Portis noticed a fresh scratch on his left "side." Portis asked him where the scratch came from and defendant replied he and Douroux were wrestling outside. He later said the scratch was from sitting outside on the grass.

¶ 42    Portis stated defendant also told him Officer Wiseman held a gun on him and then stated he only thought Wiseman held a gun on him. Portis asked defendant what he was doing prior to being at Douroux's house and he stated he was at Tucker's brother's house drinking with him. Defendant stated he left that house when Tucker's brother did. Portis asked him if he saw anything on his way to Douroux's house, and defendant stated he saw a little white boy and girl playing. He had seen them before and he always talked to children. He then denied raping a two- or three-year-old girl. Portis denied ever talking about the age of the victim with defendant.

¶ 43    Rantoul police officer Glenn Williams testified he participated in the execution of a

search warrant at the Tucker residence in the early morning hours of August 9, 1980. The utility room where the victim's body was found was a very small room but contained a double bed situated 6 to 10 inches from the door. The room was in disarray, with clothing strewn about and sheets rolled up on the bed. There was a large bloodstain on the bed and what appeared to be fecal matter "streaked down the wall." Williams testified to evidence seized, including a crumpled paper towel containing bloodstains from the bathroom sink. Williams transported defendant to the Champaign County jail on the evening of August 8, 1980, after his arrest. During the transport, his vehicle was followed closely by a vehicle from a local television station and defendant hid his head from the cameras. Williams had also seen defendant during the day of August 8 as Williams was off duty and happened to pass by the Tucker house several times. Defendant was sitting on the front porch of the Tucker house.

¶ 44    Dr. Stanley Bobowski testified to the autopsy results. They showed dried blood above the victim's vaginal area and fecal matter in the anal area. Dr. Bobowski opined the victim died of "acute asphyxia." He further observed the victim's vaginal area was abnormally dilated and inflamed and the condition was of traumatic origin. Dr. Bobowski's examination of vaginal tissues also revealed the presence of a single sperm head.

¶ 45    Officer Larry Zonfrilli of the Rantoul police department also participated in the execution of the search warrant at the Tucker house. During the search of the house, a paper towel soaked in blood was found on the edge of the sink in the bathroom. He also had a conversation with defendant at the Rantoul police department at about 10:45 a.m. on August 9. After *Miranda* warnings, defendant stated he had been at the Tucker house during the daylight hours of August 8 drinking alcohol with Maurice Tucker until approximately 45 minutes prior to the police arriving to arrest him. Zonfrilli asked defendant if he had seen any little children in the area that day and he stated he had seen several small children in the area and mentioned a little girl living next door to the Tuckers.

¶ 46    Michael Robb, a special agent for what was then known as the Illinois Department of Law Enforcement, testified he held an investigative interview with defendant on August 11, 1980. After obtaining a *Miranda* waiver from defendant, he asked him (question framed by the prosecution) "whether he had killed a three-year-old girl on August 8, 1980." Robb testified defendant responded, "It's possible." The rather lengthy interview was not taped, nor was a transcript made of it.

¶ 47    Dr. Jose Raquel testified he conducted a physical examination of defendant on August 8, 1980, after his arrest. Dr. Raquel found defendant's penis to be markedly reddened and to bear what he opined was fecal matter under the foreskin. Dr. Raquel was cross-examined about lab reports on the swabs taken from defendant's penis where he claimed fecal matter was located. The lab reports indicated no growth of the common bacteria which should result if the matter were actually fecal matter. Dr. Raquel still insisted he found fecal matter present. Officer Portis was present for the physical examination of defendant and noted grass in defendant's groin area.

¶ 48    Defendant's hair samples did not match hair samples taken from the scene of the crime. Many blood and semen stains were present on the bedding taken from Maurice Tucker's bed.

FBI Agent Beams testified as to what they showed. The inference, as noted above, was defendant could not be excluded from the 20% of the male population who could have been sperm or blood donors in this case.

¶ 49 Corey Stark testified he was a backyard neighbor of the Tuckers in 1980 and was 13 years old. He was in his backyard with his dog on August 8, 1980, when he saw a man come out of the back door of the Tucker house at about 7 p.m. Stark testified he got a good look at the man from the side who ducked down by a car parked in the Tuckers' driveway before he walked away down the street. Stark felt he would recognize the man if he saw him again. Stark viewed a lineup which included defendant but did not identify him.

¶ 50 Ida Parker testified she arrived at the Tucker house with Sonny in the afternoon of August 8, 1980, and saw defendant wearing burgundy pants, not jeans. Sonny, Maurice, and defendant were all drinking. Parker said they all left the house, with defendant leaving first.

¶ 51 Defendant did not testify.

¶ 52 The State used all of this evidence, but particularly the serological evidence, to posit its theory of the case to the jury by arguing defendant raped and then murdered the victim. This theory was mentioned five or six times during closing argument, and the State's original argument ended with the statement defendant put his penis into the victim "just prior to murdering her." The trial court and the State downplay the importance of the serological evidence from the trial to argue the State did not rely on it to obtain its conviction as the rest of the evidence is enough to convict defendant of murder. The State contends the DNA evidence refuting the inference defendant raped the victim and then murdered her would be of little probative importance in the event of a new trial. We disagree.

¶ 53 A considerable amount of time was spent at trial with FBI Agent Beam explaining how the serological evidence available at the time of trial included defendant as a possible perpetrator of the crime. No one else was considered as a possible perpetrator. The State mentioned the "rape-then-murder" theory several times during its closing argument to the jury. This was the State's theory of the case. No eyewitness to the crime was presented to the jury, and the jury was told to rely on the State's theory as to how this crime occurred.

¶ 54 The items tested for DNA included bedding taken from the bed where the victim's body was found as well as the blue jeans found on the floor of the bedroom and the bloodstained paper towel found in the bathroom. The blue jeans yielded no blood or semen stains to test. The blood on the paper towel was not a DNA match for defendant. None of the blood or semen stains found on the bedding were a DNA match for defendant. Some of the blood was a DNA match for the victim. Some of the semen and blood was a DNA match for Maurice Tucker, and some of the semen was unable to be matched and was labeled as from an unknown male. Although swabs were taken from the victim's skin and her vagina, these items were lost or misplaced by the time DNA testing began and were unable to be tested.

¶ 55 The DNA expert's affidavit noted that the semen was mixed with the victim's blood and in some instances it was on top of her blood on the bedding. He concluded the deposits of blood and semen could only have occurred at the same time. This testimony was not refuted by any other evidence.

¶ 56 The trial court found the DNA evidence does not exonerate defendant as there could have

been another perpetrator involved. This theory was never presented to the jury for its consideration. It was neither mentioned in anyone's testimony nor in argument by either counsel. It is mere speculation. The State now argues several different scenarios never presented to the jury. It agrees with the trial court on the "possible second-perpetrator" theory. The State also contends defendant may have used a condom. This theory would not jibe with the testimony of Dr. Raquel that he found fecal matter under the foreskin of defendant's penis. The State also conjectures defendant may have failed to ejaculate. This theory, as does the original theory, runs into the problem of finding no traces of blood or semen stains on any swabs done of defendant's penis and inner thighs. The State contends defendant may have cleansed himself but this contention runs counter to Dr. Raquel's finding of fecal matter under defendant's foreskin and Officer Portis' testimony he saw grass in defendant's groin area while viewing Raquel's examination of defendant.

¶ 57 The DNA evidence casts a shadow on the credibility of the testimony of Maurice Tucker at trial. He was a DNA match for some of the semen and blood samples tested, and he had a significant reason to fabricate testimony implicating defendant in the crime.

¶ 58 The trial court also relied on the inculpatory statements attributed to defendant. At the time Douroux told police officers of defendant's purported statement to him, he was himself a suspect and hair samples were taken from him at the time. The portion of the statement Douroux attributes to defendant–referencing what the town of Rantoul's reaction would be if a black man murdered a white woman–was not included in the police reports of the time and it was not part of Douroux's testimony at the first trial.

¶ 59 The statements attributed to defendant by Officer Portis concerning the age of the young girl who was raped and murdered ranged from ages two to seven. This does not unequivocally show defendant knew details of the crime as suggested by the State. Portis also claimed he did not tell defendant the nature of the crime but Douroux stated he did. Portis also admitted defendant told him Officer Wiseman told him. This might explain how defendant came to know it.

¶ 60 The statement it was possible defendant murdered the victim attributed to him by Special Agent Robb was in response to a question asking if it were possible and came during a lengthy interview which was not recorded, nor did Robb include the details in any report. Robb admitted defendant consistently denied raping or murdering the victim.

¶ 61 These competing or conflicting pieces of evidence do not show defendant would be found not guilty. The DNA evidence arguably now excludes defendant and includes Maurice Tucker and cannot be assessed in a vacuum. It changes how a jury would view all the evidence. Given the State's theory of the case, the new DNA evidence undermines confidence in the outcome of the trial.

¶ 62 New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial. It need only be *conclusive* enough to *probably* change the result upon retrial. *Gabriel*, 398 Ill. App. 3d at 350, 924 N.E.2d at 1150.

¶ 63 It is important to clarify what is meant by the phrase "probably change the result" upon retrial. In the context of a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)), the Supreme Court of the United States recently explained, "A reasonable probability does not

mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.' " *Smith v. Cain*, 565 U.S. ___, ___, 132 S. Ct. 627, 630 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The phrase is also explained or clarified in the same way in *Strickland v. Washington*, 466 U.S. 668, 694 (1984), in the context of an ineffective assistance of trial counsel claim.

¶ 64    Taking all of the evidence at trial together with the newly discovered DNA evidence, and viewing it in the light of the State's claim before the jury as to how this crime occurred and the necessity to change that theory now due to the DNA evidence, we find the trial court abused its discretion in finding the DNA evidence was not sufficiently conclusive to undermine confidence in the outcome of the trial. We reverse and remand for a new trial.

¶ 65                                        III. CONCLUSION

¶ 66    For the foregoing reasons, we reverse the trial court's judgment and remand for a new trial.

¶ 67    Reversed and remanded.