2020 IL App (1st) 172818-U

SIXTH DIVISION
September 11, 2020

No. 1-17-2818

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 91 CR 28295 |
| | ) | |
| MICHAEL WILLIAMS, | ) | Matthew E. Coghlan, |
| | ) | Judge Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Griffin concurred in the judgment and opinion.

**ORDER**

¶ 1  *Held:*  Newly discovered evidence of DNA test results showing certain blood samples to be one of the victims' blood was not material or noncumulative and would not conclusively change the result on retrial.

¶ 2  Petitioner-appellant Michael Williams (defendant) appeals from the circuit court's denial of his motion for leave to file a successive postconviction petition. In his *pro se* petition, defendant argued that in 2016 he discovered that the DNA testing from three blood samples taken from around the apartment matched one of the victims, Delroy Reese, and not the decedent, Gail Conyers. Defendant alleged that the forensic biologist at trial testified that the

blood samples belonged to Conyers. According to defendant, the results of the new DNA testing refuted the forensic scientist's trial testimony, as well as certain witnesses' versions of the events, and would have led to a different outcome at trial if presented. We disagree. For the following reasons, we affirm the trial court's denial of leave to file a successive postconviction petition.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with first-degree murder, attempted murder, armed robbery and criminal sexual assault in connection with the death of Gail Conyers and the severe beating of Delroy Reese. In 1994, following a jury trial, defendant was convicted of the first-degree murder of Conyers, the attempted murder of Reese, and the armed robbery of both, but was acquitted of criminal sexual assault against Conyers. Defendant was sentenced to life in prison.

¶ 5                                    A. Trial

¶ 6      At trial, the following pertinent testimony was presented. Reese testified that on the night in question, after he finished work, he went to the home of his girlfriend, Conyers. Later that evening, Reese's nephew, codefendant Delking Trimble, arrived at Conyers' home, along with defendant. Reese knew defendant as "Ike." At some point, Reese went into Conyers' bedroom to take a nap. He took his glasses and shoes off and laid down on the bed.

¶ 7      Reese testified that he awoke to Trimble's hands around his back, and that Trimble had him in a brace. Conyers was "in my front pockets." Reese began to struggle and asked what was going on. He then turned and saw that defendant "had his bat." Defendant struck Reese on the side of the head with it while someone went through his pockets. Reese testified that defendant repeatedly struck him in the head, but he was eventually able to escape.

¶ 8     Reese was found by police officers and taken to the hospital. The next day, he spoke to police officers while he was in the hospital and told them that defendant hit him with a baseball bat. He identified defendant from a photo array. He also identified Trimble and told police that Trimble had held him but did not hit him.

¶ 9     Reese spent six weeks in the hospital and underwent two major surgeries. He testified that he did not remember the first conversation that he had with police on the day he arrived at the hospital. Reese denied telling officers at the hospital that there were three black men involved in the incident.

¶ 10    Trimble testified that on the night in question he and defendant walked over to Conyers' house. Reese, his uncle, gave him money to buy cigarettes and alcohol. Then they all went upstairs to Conyers' apartment. At about 10:30 p.m., Trimble asked Reese for money, but Reese said no. Conyers then asked for money and Reese gave her $30. Reese then went into the bedroom. Trimble testified that Conyers and defendant went to "the drug house" and came back with cocaine.

¶ 11    Trimble testified that defendant asked Trimble to rob Reese. Defendant, Conyers, and Trimble went into the bedroom and Trimble put his arms around Reese while Conyers went through Reese's pockets. Trimble lost his hold on Reese and defendant began hitting Reese in the head with a baseball bat. Defendant continued to hit Reese with a baseball bat as Reese ran outside.

¶ 12    Trimble testified that defendant then returned to the apartment and hit Conyers in the head with the bat "10 times." Defendant took Conyers' pants off and found money. Trimble testified that defendant then hit her again and raped her. Defendant dragged Conyers into the bedroom. When asked if he left her in the bedroom, Trimble stated, "no," and said he put "her

back out front." They left and defendant offered Trimble half the money, but Trimble refused. Trimble denied hitting either his uncle or Conyers with the bat.

¶ 13    Trimble stated that he was arrested by police and lied at first because he did not want to get involved. Eventually he told officers about how he and defendant had agreed to rob Reese. An assistant state's attorney (ASA) wrote out his statement, which he signed. Trimble, who was charged with the same offenses as defendant, testified against defendant in exchange for a 30-year sentence to be served at 50%. He pled guilty.

¶ 14    Detective William Marley testified that on 7:30 p.m., he went to Conyers' apartment. There were blood spatters on the tile floor of the front hall, and blood smears on the wall. Detective Marley saw a trail of blood up the stairs and on the walls all the way up to the landing of the second-floor stairway. Inside the apartment, there was a common hallway that joined all the rooms – the front room, bedrooms, and the kitchen. There was a large amount of blood on the floors and walls in the hallway. Conyers' body was lying in the front living room on her back. She was naked from the waist down. There were blood spatters on all four walls, the ceiling, and on the rug. In one of the bedrooms there was a large pool of blood on the bed. No blood was found in the kitchen or in the second bedroom.

¶ 15    Detective Marley testified that Reese's wife and son arrived at the apartment during his investigation, and said they had just come from visiting Reese and that Reese told them he was beaten by a man named "Ike" and that Trimble was there too. Reese's son told Detective Marley where Ike's girlfriend lived, and Detective Marley went to that address. Defendant's girlfriend gave Detective Marley defendant's address. Detective Marley went to that address, but defendant was not there.

¶ 16    The following day, Detective Marley and Detective Michael Roland went to the hospital to interview Reese. Reese identified defendant as the person who beat him and identified him from a photo array. Reese stated that his nephew, Trimble, was also a participant and identified Trimble from a photo array. Detective Marley then went to Area Two and interviewed Trimble who denied involvement in the incident and did not state that defendant was involved.

¶ 17    Two days later, Detective Marley interviewed Trimble a second time, at which point Trimble stated that he and defendant were involved in the incident. An arrest warrant was issued for defendant, and about a week later he was taken into custody.

¶ 18    ASA Joan O'Brien testified that she interviewed Reese at the hospital and that she interviewed Trimble at Area Two. Trimble admitted his involvement and implicated defendant. He agreed to have his statement written but told O'Brien that he could read the statement only if the words were printed and if they went slowly.

¶ 19    Trimble's statement to O'Brien was substantially similar to his trial testimony, but he stated that after the incident, he went home. He and defendant lived together, but defendant did not come home until later. Later in the day, Trimble banged his hand on the boiler at home because he was feeling bad about what happened.

¶ 20    Doctor Michael Paciorek testified that he treated Reese in the hospital. Reese suffered from a depressed skull fractur behind his ear, and multiple other blunt traumatic injuries to the skull from the beating. His cheeks were flattened and completely crushed laterally from the impact of the bat. The bony rim circling his eye was crushed, and the eye was pushed back into the skull. Reese also suffered from a broken nose, a fractured forehead, as well as a fracture within the brain case itself, which caused cerebral spinal fluid to leak out through the nose. Reese underwent emergency surgery to repair the depressed skull fracture.

¶ 21　Forensic scientist Ralph Diaz testified as an expert in the field of forensic biology involving semen and blood. He testified that Conyers was blood type O, Trimble was blood type O, and defendant was blood type B. Diaz determined that the blood from the mattress in the bed, the bathroom hall, and the north wall of the interior hallway, were all blood type O. The blood recovered from the exterior hallway, the corner of the fireplace in the living room, and the rug in the living room, was inconclusive. The sample from the condom was indicative of the presence of semen, but the sample was inconclusive for blood typing.

¶ 22　Diaz testified that the vaginal swab taken from Conyers indicated the presence of semen that was blood type O. Based on his analysis, he could not draw any conclusions of scientific certainty as to who deposited that semen, but it could not have been Trimble or defendant. Reese's blood type was not tested.

¶ 23　Anthony Sein testified for the defense that on March 21, 1994, he was in a holding cell with defendant and Trimble. Trimble stated that defendant did not have anything to do with it and that Trimble knowingly acted on his own. Trimble then signed a statement in front of him.

¶ 24　Sometime after the jury was sent to deliberate, the jurors sent out a note that stated:

> "[We] have two members of the jury that have indicated that they are not sure the defendant was even at the scene of the crime, in fact they feel that there was absolutely no evidence that truly put him at the scene of the crime. They also feel that the witnesses were not accurate or consistent in their testimonies. Where do we go from here?"

¶ 25　The jury was only told to continue to deliberate. At 9:33 p.m. that night, the jury came back with a verdict of not guilty of aggravated criminal sexual assault and guilty of murder, attempted murder, and both counts of armed robbery.

¶ 26    Defendant filed a motion for a new trial and at the hearing, Ben Howell, defendant's uncle, testified that he owned the building in which Trimble and defendant lived on the day of the murder. Howell stated that he saw Trimble that night at about 11 p.m. and that Trimble was "very confused, he was hollering, talking about he killed the bitch, something like that." Howell saw Trimble punching the boiler and that Trimble said, "I didn't mean to kill the bitch." Howell thought Trimble was high, so he did not ask Trimble anything further.

¶ 27    The trial court denied the motion for a new trial and defendant was sentenced to life in prison.

¶ 28                              B. Direct Appeal

¶ 29    On appeal, defendant argued that the trial court improperly admitted oral and written evidence of Trimble's prior consistent statement and that the trial court improperly allowed the jury to view a "mugshot" of defendant. We found that Trimble's prior consistent statement was properly admitted to rebut the inference created by defense counsel that Trimble was motivated to testify falsely at trial. We held that the mugshot was erroneously admitted but constituted harmless error. We affirmed defendant's conviction and sentence. See *People v. Williams*, No. 1-95-0309 (May 19, 1997) (unpublished order under Supreme Court Rule 23).

¶ 30                          C. Postconviction Petitions

¶ 31    Defendant filed his first postconviction petition in 2001, arguing that his sentence was excessive, that there was a variance in the indictment, and that he received ineffective assistance of both trial and appellate counsel. The petition was summarily dismissed in a written order on September 14, 2001.

¶ 32    Defendant then filed a *pro se* motion for leave to file a second postconviction petition on April 26, 2005.  He argued that his Sixth and Fourteenth Amendment rights were violated under

7

*Crawford v. Washington*, 541 U.S. 35 (2004), where he was unable to cross-examine Reese's wife and son regarding statements they made to Detective Marley. The court found that defendant failed to establish cause and prejudice as to why he could not have included that issue in his first postconviction petition. The petition was dismissed in a written order on June 7, 2005.

¶ 33    In 2007, defendant filed a motion requesting forensic testing that was not available at trial regarding actual innocence pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2006)). DNA analysis had advanced since the time of defendant's trial, and defendant sought to have the blood and semen found at the scene analyzed. The circuit court denied the motion as to the blood evidence in the apartment but granted it as to the vaginal and anal swabs taken from Conyers.

¶ 34    When the sample from the vaginal swab was tested, the results positively excluded defendant as a contributor. The results also indicated the presence of material from one or two unknown subjects other than Reese, Trimble, or defendant. Based on this evidence, defendant sought to file a successive postconviction petition alleging actual innocence. The circuit court granted leave for defendant to file his successive postconviction petition on November 5, 2009.

¶ 35    Approximately nine months later, while the petition was still pending at the second stage of proceedings, defendant's postconviction counsel informed the court that he was in possession of three affidavits that had been obtained by defendant. The affidavits were from men who had been incarcerated with Trimble, and each affidavit purported to show that Trimble had testified falsely against defendant in order to avoid the death penalty. Two of the affidavits dated from 1997 and 2001, but the third was dated March 2010. Postconviction counsel asked the court for leave to supplement or amend the postconviction petition, but the State objected. The State argued that the affidavits were not related to newly discovered DNA evidence, and it would

therefore be improper to allow defendant to "bootstrap" these new claims into his postconviction petition. The court denied the motion to amend.

¶ 36    At the evidentiary hearing on defendant's postconviction petition, which was held on April 14, 2011, the trial court heard testimony of two defense experts who had tested the samples obtained from vaginal and anal swabs of Conyers. The expert who tested the anal swab testified that the DNA in the sample was a mixture from two people, one of whom was Conyers, and one who matched Reese. The expert testified that the sample did not match either Trimble or defendant.

¶ 37    The other expert tested the vaginal swab using a type of analysis that only identifies male DNA. The expert found that the sperm portion of the sample could potentially have come from Reese but could not have come from either Trimble or defendant. There was also a "minor" profile that did not match Reese, Trimble, or Williams. After hearing the evidence, the circuit court denied the petition. In its written order, the court found that the fact that defendant's DNA was not found in the victim's vagina was cumulative and already presented to the jury. The court found that the evidence was not of such a conclusive nature that it would have changed the result of the original trial. At most, the court found, the results merely indicated that Conyers had sexual intercourse with both Reese and a man other than defendant at some point in the 72 hours preceding her death.

¶ 38    Defendant appealed the denial of his successive postconviction petition, arguing that the DNA evidence constituted newly discovered evidence of his actual innocence. *People v. Williams*, 2013 IL App (1st) 112038-U. This court found that the results of the new DNA analysis of the evidence were very similar to the results of the blood typing that was presented at trial. *Id.* ¶ 23. We noted that in the original trial, expert witnesses testified that defendant was

excluded as a contributor for the semen found in Conyers' vagina. *Id*. The sample was determined to be type O, but defendant was type B. *Id*. Although the two tests were different, the results were the same – defendant was excluded as a contributor. *Id*. We found that the evidence related to the vaginal swab would be cumulative to what was presented at trial. *Id*.

¶ 39    Defendant argued that even if the results of the vaginal swab were cumulative, the results of the anal swab were not because the original results were inconclusive, but the new results excluded defendant as a contributor. *Id*. ¶ 24. This court noted that the jury acquitted defendant of sexual assault. *Id*. We found that given that the only evidence that defendant committed sexual assault was Trimble's testimony on the subject, the fact that the jury acquitted defendant of the sexual assault necessarily meant that the jury did not accept Trimble's testimony about the assault. *Id*.

¶ 40    This court also found that the affidavits that postconviction counsel attempted to add to the successive postconviction petition had no relation to the new DNA analysis that was at issue in the petition. *Id*. ¶ 30. We further found that even if the affidavits could be considered separate proof of defendant's actual innocence, there was no indication that they were newly discovered evidence. *Id*.

¶ 41    In February 2014, defendant filed two motions for forensic testing. The first motion requested DNA testing on six blood samples taken from the crime scene and four items – three pieces of clothing and a pillow – that were found on or near Conyers' body. The second motion requested that unidentified fingerprints from the crime scene be tested and run through a fingerprint database. The State agreed to the requested testing.

¶ 42    The order that the parties submitted to the court stated, "Agreed Order for Post-Conviction DNA Testing and Fingerprint Analysis Pursuant to 725 ILCS 5/116-3," but the text

of the order only mentioned the six blood samples and did not mention the clothing, pillow, or fingerprint testing requested in defendant's second motion.

¶ 43     The agreed order was entered on May 21, 2015, and the results were returned on May 13, 2016. The results of the tests showed that the blood samples obtained from the mattress in the bedroom, north interior wall, and the bathroom hallway, matched the DNA of Reese. The blood from the fireplace and the rug matched Conyers.

¶ 44     On November 10, 2016, defendant's appointed counsel told the court that "upon examining the results, our office has determined not to go any further. And we would ask for the case to be taken off the call." The court asked if this was originally a *pro se* motion, and whether the parties had agreed to the testing. The State confirmed that they had, and the court asked what the results were. Appointed counsel stated that several items were tested in various places in the apartment, and the results indicated that there was a match with the victims in the case. The court then asked if defendant filed any other pleadings along with his motion for DNA testing and postconviction counsel replied, "No." The matter was ordered "off call."

¶ 45     On August 9, 2017, defendant filed a motion for leave to file another successive *pro se* postconviction petition. In his motion, he alleged a due process violation and denial of his right to a fair trial, claiming he would not have been proven guilty beyond a reasonable doubt if the combined DNA results obtained from his section 116-3 motion and new blood test results had been before the jury. He also alleged that his conviction was the result of inaccurate and perjured testimony. Defendant argued that while Diaz testified at trial that the blood on the mattress came from Conyers, the new results showed it came from Reese, contradicting Trimble's testimony that defendant dragged Conyers into the bedroom. Defendant attached exhibits to the petition, including a copy of the May 13, 2016, lab report showing the blood sample DNA results that

were obtained as a result of the section 116-3 motion, and the December 16, 2008 lab report showing the rectal swab DNA results.

¶ 46    On September 29, 2017, the court denied leave stating that while the 2016 testing "may constitute new evidence," it was "cumulative," and not of such a conclusive character that it would probably change the result on retrial. The court noted that a finding of Reese's blood on the mattress was consistent with the trial testimony that Reese was beaten with a bat on the bed. It further found that the absence of Conyers' blood on the mattress was not inconsistent with the trial testimony that defendant dragged her into the bedroom after the beating "and does not mention the mattress." The court noted that the jury's finding of not guilty of aggravated sexual assault meant that it did not find that portion of Trimble's testimony to be sufficient for proof beyond a reasonable doubt that defendant raped Conyers. Finally, the trial court found that Diaz's testimony only indicated that the blood on the mattress was type O, which was the same type as Conyers', but also could have been the same type as Reese's.

¶ 47    Defendant now appeals from the court's denial of his motion for leave to file a successive postconviction petition.

¶ 48                                    II. ANALYSIS

¶ 49    On appeal, defendant contends that the trial court should have granted him leave to file his *pro se* successive postconviction petition because it sufficiently set forth a claim of actual innocence based on newly discovered evidence. Specifically, defendant argues that the blood samples from the mattress, the north wall of the interior hall, and the bathroom hallway have now been identified as Reese's blood, not Conyers' blood. The State maintains that defendant was properly denied leave to file his petition where he did not establish a colorable claim of

12

actual innocence because the results of the 2016 DNA testing merely corroborated the trial witnesses' testimony about where the victims' blood would be found in the apartment.

¶ 50    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), provides a method by which a defendant can assert that his conviction was the result of a substantial denial of his rights under the United States Constitution or the Illinois Constitution or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act is not a substitute for an appeal but, rather is a collateral attack on a final judgment. *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989). When, as here, a defendant has previously taken an appeal from a judgement of conviction, the ensuing judgment of the reviewing court will bar, under the doctrine of *res judicata*, postconviction review of all issues actually decided by the reviewing court, and any other claims that could have been presented to the reviewing court will be deemed forfeited. *People v. Jones*, 2017 IL App (1st) 123371, ¶ 40.

¶ 51    Successive postconviction petitions are disfavored under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 29. The Act provides that any claim of substantial denial of constitutional rights not raised in the original or amended petition is subject to the doctrines of *res judicata* and forfeiture. *Jones*, 2017 IL App (1st) 123371, ¶ 41. However, the forfeiture provision can be lifted, and a successive petition can be considered on the merits if it either meets the cause and prejudice test of section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2016)), or its consideration is necessary because the defendant shows a claim of actual innocence. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A defendant seeking to file a successive postconviction proceeding must first obtain leave of the court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010). To set forth a claim of actual innocence in a successive petition, the defendant's "request for leave of court and his supporting documentation must raise the probability that it is

13

more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Edwards*, 2012 IL 111711, ¶ 31.

¶ 52    Requests to file successive petitions are reviewed under a higher standard than the first-stage standard for initial postconviction petitions, which is simply a determination of whether the petition is frivolous or patently without merit. *People v. Smith*, 2014 IL 115946, ¶ 35. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Generally, decisions granting or denying "leave of court" are reviewed for an abuse of discretion. *Edwards*, 2012 IL 111711, ¶ 30. However, as we just noted, a trial court should deny leave only in cases where, as a matter of law, no colorable claim of actual innocence has been asserted. This suggests a *de novo* review. *Id*. We need not decide this question in this case, however, because defendant's claim of actual innocence fails under either standard. *Id*.

¶ 53    Where, as here, a defendant's successive postconviction petition makes a claim of actual innocence, such a claim may only be considered if the evidence in support of the claim was newly discovered, material to the issue and not merely cumulative of other trial evidence, and of such conclusive nature that it probably would change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47 (citing *Edwards*, 2012 IL 111711, ¶ 32); *People v. Ortiz*, 235 Ill. 2d 319, 333-34 (2009). New means the evidence was discovered after the trial and could not have been discovered earlier through the exercise of due diligence. *Ortiz*, 235 Ill. 2d at 334. Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means the evidence adds to what the jury heard (*Id*.), but evidence

is considered cumulative when it adds nothing to what was already before the jury (*Ortiz*, 235 Ill. 2d at 335). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96.

¶ 54    Turning to the evidence at issue here, we first note that the blood samples that are the subject of this successive postconviction petition were retested in 2016 using a type of DNA testing that was not available at the time of defendant's trial in 1994. The test results constitute newly discovered evidence since the results could not have been discovered before trial. See *Ortiz*, 235 Ill. 2d at 334 (evidence is "newly discovered" if it could not have been discovered before trial using due diligence).

¶ 55    The question then is whether this newly discovered evidence is material and noncumulative. Defendant contends that the new DNA test results are material because they contradict Trimble's testimony, and they are not cumulative of any other evidence. First, defendant contends that at trial, Diaz testified that the blood sample from the mattress in the bedroom matched Conyers' blood, which was consistent with Trimble's testimony that defendant dragged Conyers into the bedroom, but the new DNA test results show that the blood obtained from the mattress was not Conyers' blood but Reese's blood. While it is true that Diaz testified that the blood found on the mattress was blood type O, he did not say that the blood was Conyers' blood. Rather, he testified that Conyers' blood was also blood type O, which was the same blood type found on the mattress. Reese's blood type was never presented to the jury. Notably, blood type O is the most common blood group in the United States. See *People v. Davis*, 2012 IL App (4th) 110305, ¶ 29. Accordingly, the new DNA test results showing that the

blood on the mattress was Reese's blood does not contradict Diaz's testimony regarding the blood type O on the mattress.

¶ 56    Moreover, the presence of Reese's blood on the mattress was consistent with Reese's testimony that he was beaten in the head with a baseball bat while he was in bed. It was also consistent with Trimble's testimony that Reese was hit repeatedly in the head with a baseball bat while in bed. While defendant points out that Trimble testified that Conyers' body was dragged into the bedroom, Trimble's testimony was that defendant dragged Conyers into the bedroom but did not leave her there – rather he dragged her back out into the front room. Trimble never testified that Conyers was on the bed. The newly discovered evidence of Reese's blood on the mattress is not material or noncumulative to the evidence that was presented at trial.

¶ 57    Next, defendant claims that Diaz incorrectly testified that blood from the "north wall of the interior hall" came from Conyers, because the new DNA results show that this was actually Reese's blood. However, we note again that Diaz merely testified that the blood type that was found on the north wall of the interior hall was type O blood, which was "consistent" with Conyers' blood type. Diaz did not testify that it was Conyers' blood on that wall. Defendant contends that the blood identified as Reese's instead of Conyers' contradicts Trimble's claim that after defendant hit Conyers with the bat, Conyers' "head hit the wall in the front room." However, there was no testimony that Conyers was hit in the head in the hallway, which is where the blood sample at issue was found. Rather, the testimony at trial was that Conyers was hit in the head in the front living room of the apartment. Accordingly, this new evidence identifying Reese's blood in the hallway by the front door is merely cumulative of the evidence already presented by both Trimble and Reese that after Reese was hit in the head multiple times with a bat, he escaped out the front door.

¶ 58    Defendant also contends that defendant Diaz's testimony was "perjured" and "inaccurate" because Diaz testified that the blood from the bathroom hallway was Conyers' blood, but the new DNA results show that the blood sample was actually Reese's blood. Again, Diaz did not testify that the blood was Conyers' blood, but rather that it was type O blood, which was "consistent" with Conyers' blood type. The 2016 DNA results show that Reese was the major contributor to the bathroom hallway sample, but that Conyers could not be excluded as a minor contributor to the sample. This supports Trimble's testimony that Conyers was dragged around the apartment after she was hit in the head with a bat.

¶ 59    Finally, defendant notes that there is an inconsistency between Diaz's report and his testimony at trial regarding the blood sample obtained from the fireplace in the front room where Conyers was found. Diaz testified at trial that the blood sample was inconclusive for ABO blood typing. However, his report shows that the sample was blood type O. First, this issue has been forfeited as it could have been raised on direct appeal. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010) (issues that could have been raised on direct appeal, but were not, are forfeited). Forfeiture aside, Diaz's testimony that the blood sample from the fireplace was inconclusive was not in any way indicative of defendant's guilt. The fact that it was blood type O – the same blood type of Conyers – would only have bolstered the testimony presented that Conyers was beaten in the head with a baseball bat in the front living room.

¶ 60    Even assuming the 2016 DNA test results were noncumulative and material, we would find that the evidence is not of such a conclusive character that it would probably change the result on retrial. See *Robinson*, 2020 IL 123849, ¶ 47. The new test results indicate that the blood on the mattress, as well as blood samples from the hallway, came from Reese. Both Reese and Trimble testified at trial that Reese was awakened from a nap and beaten with a baseball bat until

he was able to make his escape. The blood on the mattress and in the hallway of the apartment was consistent with that testimony. Trimble's testimony regarding Conyers being dragged into the bedroom and then back into the front room was not contradicted by the new DNA results. Trimble never testified that Conyers' body was on the bed at any point. While Diaz testified at trial that those blood samples were blood type O, which was consistent with Conyers' blood type, Diaz never testified that the samples were Conyers' blood. The 2016 DNA test results merely corroborate the evidence that was already presented at trial, and we therefore find that this evidence is not so conclusive that it would probably change the result on retrial. See *Robinson*, 2020 IL 123849, ¶ 47. Accordingly, because successive petitions are reviewed under a higher standard than first-stage postconviction petitions, and leave of court to file a successive petition should be denied when it is clear that the claims alleged by defendant fail as a matter or law, we affirm the trial court's denial of defendant's request for leave to file a successive postconviction petition. *Smith*, 2014 IL 115946, ¶ 35.

¶ 61                                    III. CONCLUSION

¶ 62     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 63     Affirmed.