THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANDRE DAVIS, Defendant-Appellant.

Fourth District    No. 16995

Opinion filed April 8, 1982.

Daniel D. Yuhas and Janet Sinder, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Donald R. Parkinson and Timothy Andrew Swain, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Defendant was charged in a five-count information with the offense of murder in violation of section 9—1 of the Criminal Code of 1961. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1.) Four counts alleged felony murder in that he killed Brianna Stickle without lawful justification while commit-

ting the forcible felonies of rape, indecent liberties with a child, and aggravated kidnapping (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), and the fifth count alleged that he killed Brianna Stickle without lawful justification by suffocating her knowing that such acts created a strong probability of death or great bodily harm. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2).

A jury trial was held in the circuit court of Champaign County, and the jury returned a general verdict of guilty of murder. The same jury returned for a separate sentencing proceeding pursuant to section 9—1(d)(1) Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)(1)) to determine the question of imposition of the death penalty. It first found defendant eligible for the death penalty by reason of an aggravating factor, specifically that the victim was killed in the course of other felonies, aggravated kidnapping, indecent liberties with a child and rape. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).) The same jury was then further recalled to consider factors in aggravation and mitigation. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).) Its third, and final, verdict was that it was unable to agree unanimously that the defendant should be sentenced to death. The court therefore sentenced defendant to a term of natural life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) This appeal followed.

A moderately extended recitation of the facts is necessary in view of our disposition of the issues raised by defendant; first, a recapitulation of the facts developed at trial, and later, more specific evidence as related to the various issues.

On August 8, 1980, the victim was a three-year-old female who lived with her mother and stepfather at 1110 Eastview in Rantoul. At about 6:30 p.m. on that date she was seen sitting in the front yard of the residence and then disappeared. The house next door at 1112 Eastview was occupied by two brothers surnamed Tucker, Maurice and Lutellis, the latter also known as Sonny. A third house which figures in the story was located in the next block at 1056 Eastview and was occupied by Donald Douroux, also known as Don Juan or Juan. Defendant resided elsewhere but was acquainted with the Tuckers and Douroux and kept some clothing at the Tucker house.

Rand Spragg, the stepfather, testified that after observing the victim in the front yard at about 6:30 p.m., he found her missing shortly afterward and instituted a search about the neighborhood. He went to the Tucker house next door and knocked on the front door. No one answered, but he could hear a stereo playing at low volume. He left to pursue his search elsewhere and sometime later observed an individual, later identified as Douroux, arrive at the Tucker house. According to Spragg,

Douroux knocked on the front door and having received no answer, went to the rear and knocked on the back door; there was still no answer, whereupon he stepped inside the house for a few seconds and then came back outside.

Spragg then asked Douroux if he might go inside the Tucker house and look for the child. Douroux replied that it was not his house but that he knew the people who lived there, and gave Spragg permission to enter. Spragg and his wife went through the house but found nothing and returned out the front door. Douroux then stated that he would go back into the house and lock up. He entered and shortly returned in a semi-hysterical state, telling Spragg that there was something in the house in the back room. Spragg re-entered and found the child on a bed in a utility room at the rear of the house. She had been covered with bed clothing and was lying on her stomach, naked and bloody about the genital region.

An ambulance was summoned. A police officer, McLemore, who had earlier been involved in the search for the child, heard the call and proceeded to 1112 Eastview where he was admitted by Spragg and Douroux. He testified that while he was in the utility room with Spragg, he heard a voice say, "Officer, come here." He remained in the utility room and the voice then said, "The subject you want is at 1056." While uncertain, he testified that he believed no one else had entered or left the house. Spragg also testified that Douroux told the police on their arrival that there was a man at his house who had just been at 1112.

The child's body was removed by ambulance to a hospital at Chanute Air Force Base. She was pronounced dead on arrival. Medical evidence indicated that the cause of death was asphyxia and that a three-year old would expire in approximately 60 seconds if air were prevented from entering the nose and mouth. Further medical evidence indicated the presence of degenerated spermatozoa in the victim's vagina, which was three times its normal size. The pathologist testified that the sperm had been deposited at about the time of death and that the victim had had intercourse prior to her death.

Police officers had arrived at the Tucker house and one of them, Wiseman, after a conversation with McLemore who was already there, went to 1056 Eastview where he was met by Douroux, who told him that defendant was the one to speak with. Wiseman found defendant inside 1056 and asked him for identification. Defendant appeared nonchalant and stated that he did not know why Wiseman was there. He was wearing red pants, sox and shoes. Wiseman arrested defendant and advised him of his *Miranda* rights, but did not discuss the case with him. Defendant refused to sign a *Miranda* form and shook his head in a negative manner when the rights were read to him. Wiseman turned defendant over to

another officer, Portis, who was present during the *Miranda* admonishments.

Portis then had a conversation with defendant. Portis claimed that defendant never indicated that he did not wish to talk. He stated to Portis that he had been at Tuckers' drinking with them during the day. When the Tuckers left for the evening, he left to go to Juan's house at 1056. There, he claimed, he and Juan had wrestled on the lawn, and a fresh scratch on his left side had come from the wrestling. Portis caused defendant to disrobe and observed grass in the groin area. Later defendant stated to Portis that he did not know where the scratch had come from. Portis asked him if he had seen any children while going from Tuckers' to 1056. Defendant stated that he had seen a little white girl and a little white boy and had talked to them, but further stated, "But I didn't rape no little white girl." Portis had not informed defendant at that time of any of the facts of the case, but he knew that Wiseman had informed him of the charges at the time Wiseman arrested him.

Another officer who interviewed defendant the following day, August 9, testified that defendant told him he had been drinking at Tuckers' all day and had gone to Douroux's house about 45 to 60 minutes before the police arrived. He also told the officer that while on the way he told a little white girl to stay out of a garbage can.

Both Tucker brothers testified and corroborated the presence of defendant at their house during the day and his departure about 6 p.m. Both of them asserted that defendant was wearing blue jeans and a shirt at the time he left to go to Douroux's house. Maurice Tucker testified that defendant kept some clothing in his room, which was the utility room at 1112 Eastview, and identified the red pants which defendant was wearing at the time of arrest as belonging to defendant. He also testified that while he was with defendant they saw the victim and that he had talked with her but defendant had not. He further stated that defendant had brought a bag with clothing in it over to Tuckers' house but did not remember whether defendant had ever taken it back.

Douroux gave extensive testimony for the State. He stated that on August 8, 1980, he returned to 1056 Eastview in Rantoul from Champaign at about 6 p.m. As he pulled his car into the drive he saw defendant, who was then wearing red pants, come out from under a trailer which was parked at the rear of 1056. The trailer had some shrubbery alongside it. Defendant stated to him that he had killed a woman who lived next door to Sonny. He believed defendant was drunk and offered to call Sonny's house by telephone to prove there had been no killing. He called but received no answer, so he told defendant that he would drive down to Sonny's to determine that no dead body was there. He then did so and his

further testimony paralleled that of Spragg concerning his arrival, the discovery of the body, and the presence of the police. He stated that he was the one who told the officer to come to 1056.

The State presented medical and scientific evidence which established the following:

> 1. Both defendant and the victim had type O blood; several stains found on the bed clothing tested positively for type O; defendant is a non-secretor, that is, one whose blood type cannot be determined from bodily secretions other than blood; semen stains found in the bed clothing were determined to have come from a non-secretor; non-secretors encompass about 20% of the population.
>
> 2. Hairs found on the body of the victim were those of negroid characteristics; they were compared with samples taken from defendant and several of the State's witnesses, but none was comparable.
>
> 3. Fecal material was found under defendant's prepuce upon an examination made shortly after his arrest; defendant's penis was traumatized at the same time.

That was the State's case. Defendant's evidence was first his own testimony. He testified that he wore a pair of blue jeans at Tuckers' but changed into red pants before leaving. A small boy testified that he saw a man coming out of 1112 Eastview on the day of the murder and that the man was acting strangely. He was unable to identify that man in a lineup which included defendant, and he did not see the man in court. Ida Parker, Maurice Tucker's friend, testified that she arrived at Tuckers' to go to Champaign with him at about 4:30 to 5:00 p.m. on August 8, as Maurice had testified, and that when she arrived, the defendant was there and was wearing red pants.

We have elected to treat as the first and principal issue in this case the failure of the bailiff in charge of the jury to communicate to the trial judge an inquiry from the jury. Additional factual material is necessary to an understanding of the issue. The jury had rendered its general verdict on guilt late in the evening of January 21, 1981. It was accepted by the court and judgment was entered thereon in favor of the People and against the defendant. The trial court then recessed the jury until the following morning with instructions to return to commence the sentencing proceeding. Defendant renewed a prior motion to sequester the jury, but it was denied and the jury then separated after an admonition from the court to keep themselves completely free of any outside influence.

On the following morning, January 22, 1981, defense counsel presented to the trial court a motion for mistrial based upon information which he had received after the jury had separated. It was represented to the court that the jury had rung for the bailiff and after he appeared,

asked him if they might have a transcript. He replied that they might by midsummer. The request was never communicated to the trial judge.

After some argument in chambers, the parties repaired into open court, and the bailiff was sworn and testified essentially to the facts as recited above. He stated that he was summoned about eight minutes before the jury indicated that it had reached a verdict. Some conflict developed later on the matter of timing. An offer of proof as to what one of the jurors would say was made at the time of the post-trial motion. The offer was rejected by the trial court as impugning the verdict, but it indicated that the jury had summoned the bailiff twice, once about one to two hours before verdict; he did not answer. The second summons was about eight minutes before verdict as described by the bailiff.

After the bailiff's testimony, the court conducted an examination of the jury foreman, who was with the rest of the jury in the jury room waiting to be called into court for the sentencing proceeding. From this testimony it was ascertained that the jury was not in fact requesting an entire transcript but only one item, described by the jury foreman as "* * * time elapsing between the arrival of a certain party on the scene."

The court then stated that if a request for an entire transcript had been made, he would have had to refuse it, but if it had been for only one item, he would have granted it. He then offered to set aside the verdict, give the jury the item requested, and allow them to deliberate further. Defense counsel objected, but the court insisted that he had the right to set aside the verdict. The court then ruled that no prejudice had been shown, or at best any prejudice was speculative, and denied the motion for mistrial.

■■ It is no longer debatable that a trial court has discretion to grant a jury's request for testimony and that it is reversible error for a trial court to refuse to exercise that discretion in the erroneous belief that it does not exist. (*People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166.) The trial court here acknowledged these principles and indicated that he would have granted the jury's request if he had been aware of it. We appreciate his position, although we must demur to his characterization of the deliberations of this court as observing "the entrails of chickens."

■■ The actions of the bailiff were egregiously wrong. He was an officer of the court (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(1)) and subject to the direct supervision and instruction of the court. The ultimate responsibility for his action, or inaction, lies with the trial court. Thus the apparent inability of the court to exercise its discretion is a situation for which the court itself is responsible. The prejudice to the defendant is the same whether the court erroneously believes it has no discretion, or whether the request is never communicated to the court.

In an apparent attempt to repair the damage which had occurred, the

trial court kept referring to "no harm, no foul," an expression which we interpret to mean that the error was harmless. We cannot agree and find the language in *People v. Autman* (1974), 58 Ill. 2d 171, 177, 317 N.E.2d 570, 572-73, instructive:

> "In the Autman trial the testimony of Lewis concerning Autman's actions was in direct conflict with the testimony of officers Stahl and Stone. Although we cannot know why the jury wished to hear this testimony a second time, considering its significance, prejudicial error occurred when the court refused to consider the jury's request. In the Pulley trial the jury did not specify what testimony it wished to hear again. Since the request may have related to critical testimony, in that case too the defendant was entitled to have the request considered by the trial court."

■■ The rule then is that the court may not speculate as to reasons for the request and especially may not decide on its own that the testimony requested is not critical. It may appear not to be so to a court, but the jury is the trier of fact and its judgment as to the significance of particular items of evidence is not to be overreached by the court. We believe this is particularly true in the instant case. The evidence against the defendant was largely circumstantial and much of it was in conflict. We recited the evidence at length above, even though no question of reasonable doubt was raised on appeal, in order to demonstrate this aspect.

Furthermore, as the inquiry of the foreman shows, the nature of the testimony was described only in the most general terms. We fail to see how the trial court could have arrived at its conclusion, based on the foreman's statement, that no harm had occurred. Even in a case in which the evidence is overwhelming it is the duty of the court to furnish the jury with testimony, if it may be done without undue hardship.

■■ The trial court's proposed solution to the problem, that is, vacating the verdict, was equally erroneous. The court concluded that since the same 12 people were returning to pass upon penalty aspects of the case, the question of guilt could be resubmitted to them. This confuses the personnel of the jury with the verdict. It would not be impossible to reassemble any jury within a short time after verdict, so the fact that this jury was more accessible becomes immaterial. The governing legal proposition is that once a verdict has been rendered, accepted by the court, and judgment entered thereon, and the jury has separated, the court has lost control of the verdict, and the only remedies are either a mistrial or some variety of post-trial relief, such as judgment *n.o.v.* or new trial.

There are cases in which a jury was permitted to amend or alter its verdict, but none has been called to our attention in which it was permitted to redeliberate. In *People v. Wilson* (1972), 51 Ill. 2d 302, 281

N.E.2d 626, the jury erroneously signed only one of three verdict forms and was sent back to correct the error. In *People v. Arnett* (1951), 408 Ill. 164, 96 N.E.2d 535, the jury had erroneously signed an instruction rather than a verdict form. In none of the cases in which the jury had been sent back to correct an error, generally of a mechanical nature, had the trial court entered judgment nor had the jury separated.

Contrariwise, in *Farley v. People* (1891), 138 Ill. 97, 27 N.E. 927, the jury had sealed its verdict and returned the following day. On examination of the verdict it was discovered that the jury had not fixed the term of imprisonment for one of the defendants. Over defense objection the trial court sent the jury back to complete the verdict. The supreme court reversed, saying:

> "This is not the case of a jury having been allowed to separate during the progress of a trial, or coming in contact with the people generally, in which case it must appear that some injury resulted to the defendant, and therefore the authorities cited by counsel for the People have no application.
>
> We think there was manifest error in sending the jury to its room the second time, over defendant's objection * * *." 138 Ill. 97, 102, 27 N.E. 927, 929.

In *People v. Blair* (1914), 266 Ill. 70, 107 N.E. 116, the jury returned a sealed verdict without stipulation by the parties and separated. The supreme court reversed, holding that the defendant has a right to have the statutory provision for a sealed verdict strictly observed.

In *People v. DeStefano* (1965), 64 Ill. App. 2d 389, 212 N.E.2d 357, *cert. denied* (1966), 385 U.S. 821, 17 L. Ed. 2d 59, 87 S. Ct. 48, the trial court erroneously believed that the jury was unable to reach a unanimous verdict and thereupon declared a mistrial and dismissed the jury. It then developed that the jury had reached a verdict as to one charge. The court attempted to set aside the mistrial and accept the verdict. The appellate court reversed, holding that the integrity of a jury verdict must be above any question.

The lesson of these authorities is clear. The jury stands at the heart of the criminal justice system, and its verdict is not to be impugned except under the most extraordinary circumstances. Before judgment is entered on a verdict and before the jury has separated, a trial court may require emendations to the verdict in order that it may truly reflect the finding of the jury. (*Wilson; Arnett.*) Once judgment has been entered and the jury has separated, the trial court is foreclosed from any action regarding the verdict, except mistrial or post-trial relief, if circumstances are sufficiently grave to require that the verdict be set aside.

To paraphrase Justice Holmes on the subject of search-and-seizure, it is unfortunate that since the constable has blundered, the defendant must

be retried. However, no other solution is proper. The trial court should have granted the motion for mistrial and it was reversible error not to do so.

Since this case must be retried, it is appropriate to comment briefly on certain other issues raised by defendant in order that additional error may not recur on retrial. The first relates to the trial court's ruling on the admissibility of defendant's statements. As we have already indicated, defendant, after being arrested by Wiseman and being advised of his *Miranda* rights, shook his head in a negative fashion and refused to sign a *Miranda* form. Notwithstanding, he was interrogated further. The trial court denied a motion to suppress and in doing so applied the wrong standard. The court stated:

> "Under the *Miranda* decision, the only time, as I understand it, that interrogation must cease and may not continue is when the person being interrogated says I want to talk to a lawyer. * * * The only time that the officers are under constitutional bar from proceeding further, when there's a constitutional proscription, is when Sixth Amendment rights are implicated by the suspect saying I wish to speak to a lawyer or word to that effect in any fashion."

We have never perceived any such doctrine. In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court stated:

> "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.

The demand for an attorney is not the "only" time that questioning must cease, as the trial court held; alternatively, when the individual is alone and indicates "in any manner" that he wishes it to cease, it must do so.

In the instant case the trial court did not consider the negative nod of defendant's head in deciding whether he wished not to speak, or whether he did not understand his rights, or just what his conduct indicated. For that reason the trial court's ruling on the motion to suppress must be vacated and that matter reconsidered in the light of the proper standard and the ambiguity in the evidence. The parties have extensively argued the question of waiver in this court, but we cannot consider waiver unless and until it has been passed upon below.

Defendant next contends that the People violated the court's dis-

covery order in that they failed to indicate that one of their witnesses, Lutellis Tucker, had been convicted of a felony. Such a violation will result in reversal only when prejudice to the defendant is shown. (*People v. Bingham* (1979), 75 Ill. App. 3d 418, 394 N.E.2d 430.) No such prejudice exists here. Defendant knew of Tucker's record, and Tucker's testimony regarding the pants was only cumulative to that of his brother, although it was contradicted by the testimony of defendant himself and of Ida Parker.

■■ Tucker's conviction was discovered by accident when an assistant State's Attorney was going through some files in the office of the circuit clerk. For reasons not apparent in the record, the State's Attorney's office had no notation of it and furnished discovery from its own records. We know of no rule which requires the State's Attorney to make a search of the public records, which are equally available to the defendant, in order to perfect discovery. The State furnished what it had in its own records; no prejudice has been shown; therefore, there is no reversible error on this point.

Defendant's next claim of error is that the court used the aggravating factors found by the jury, based upon the evidence at trial, in enhancing the punishment to life imprisonment. He claims that the jury was improperly instructed at trial on the felony offenses upon which the felony murder counts were predicated and in any event none of them was proved beyond a reasonable doubt. Therefore, he asks for a resentencing. Since the case must be retried, the point appears moot. Suffice it to say, we find no merit in the argument.

■■ In connection with the foregoing, defendant first argues that kidnapping was not established beyond a reasonable doubt and therefore he could not have been found guilty of aggravated kidnapping. Aggravated kidnapping under section 10—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 10—2) is a separate offense from simple kidnapping under section 10—1 of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 10—1). It requires proof of the elements of simple kidnapping, but in addition, proof of one or more of the elements contained in section 10—2. In the instant case it was necessary to establish that the defendant knowingly and secretly confined the victim against her will. The latter was statutorily established by testimony of the victim's mother that she gave no permission nor consent to remove the child from the premises at 1110 Eastview. No dispute exists that the victim was under 13 years of age. The questions of scienter and secrecy, together with the credibility of the mother's testimony, were for the jury, which was properly instructed on the matter and found against the defendant. Thus, kidnapping was established beyond a reasonable doubt, and the age of the victim created the basis for aggravated kidnapping.

■■ Defendant also argues the *Levy-Lombardi* rule discussed in *People v. Smith* (1980), 91 Ill. App. 3d 523, 414 N.E.2d 1117. It does not apply in the instant case. The rule, briefly stated and without its ramifications, forbids the use of a charge of aggravated kidnapping in order to enhance an offense with a lighter penalty to a heavier penalty. Defendant claims that the aggravated kidnapping here was used to enhance his sentence to life imprisonment. The rule cannot apply because murder is a more serious offense than aggravated kidnapping in the first place, so there could be no enhancement, and in any event under the sentencing proceeding the additional factors of rape and indecent liberties were found to exist by the jury. Any one of these three would have been sufficient under section 9—1(b)(6)(c) of the Code. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(c).

The same may be said of the charge of rape. The jury was likewise instructed as to the issues and elements there, and the testimony of the pathologist established that the victim had had sexual intercourse before her death.

■■ As to the indecent liberties charge, defendant argues that it is an included offense of rape and therefore may not be considered by the court in imposing punishment. He relies on *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. *King* was concerned with multiple convictions and sentences growing out of one course of conduct, or a series of closely related acts, when one or more of the charges was by definition an included offense. Undoubtedly indecent liberties is an included offense of rape (*People v. Buckley* (1976), 41 Ill. App. 3d 989, 355 N.E.2d 207), but it must always be borne in mind that defendant here was convicted of a single offense, murder. We find nothing in the rationale of *King* which forfends a trial court from considering included offenses in determining aggravation at the sentencing proceeding. In *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181, two aggravating factors were alleged: (1) that the murder was committed during an aggravated kidnapping and rape, and (2) that the murdered individual was an eyewitness. The supreme court reversed because it held that the second factor did not exist as a matter of statutory interpretation. Such is not the situation in the instant case. Murder of a witness is controlled by section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(7)) while murder in the course of another felony is controlled by section 9—1(b)(6) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)), and all three felonies involved in the case at bar are specifically mentioned in subparagraph (c) of section 9—1(b)(6). In fact, several of the felonies mentioned are included offenses of others, *e.g.*, robbery and armed robbery, but there is no statutory prohibition forfending a trial court from considering all of them. In the case at bar the testimony of the pathologist would sustain either or both of the charges of rape and indecent liberties.

Defendant claims that his sentence to life imprisonment was an abuse of discretion. Since the case must be retried, we offer no opinion on the matter.

Lastly, defendant argues that the jury was death-qualified and thus was more conviction-prone. This argument was considered and rejected recently by the supreme court in *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.

■■ Because of the mishandling of the jury and because of the application of the wrong standard regarding the admission into evidence of defendant's statements, the circuit court of Champaign County was in error and defendant was thereby deprived of a fair trial. The judgment is therefore reversed and the cause remanded for a new trial in accordance with the views expressed herein. We offer no opinion as to the guilt or innocence of defendant.

Reversed and remanded for new trial.

GREEN, P. J., and TRAPP, J., concur.