2022 IL App (1st) 200287-U

No. 1-20-0287

Order filed May 18, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 21034 |
| | ) | |
| BEDNACO HARPER, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's first-stage dismissal of defendant's postconviction petition where he failed to set forth arguable claims of ineffective assistance of appellate counsel.

¶ 2    Following a jury trial, defendant Bednaco Harper was convicted of first-degree murder and concealment of a homicidal death. The trial court subsequently sentenced him to a total of 40 years' imprisonment, 35 years for murder and 5 years for concealment of a homicidal death, which by law had to be served consecutively. After exhausting his direct appeal rights, defendant filed a

petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), raising, in part, claims of ineffective assistance of appellate counsel for failing to raise challenges to the actions, or lack thereof, of the trial court and his trial counsel. The circuit court dismissed defendant's petition at the first stage of proceedings under the Act, finding that his claims were frivolous and patently without merit. Defendant now appeals the court's dismissal and contends that he set forth arguable claims of ineffective assistance of appellate counsel to survive a first-stage dismissal. For the reasons that follow, we affirm the circuit court's dismissal.

¶ 3                                         I. BACKGROUND

¶ 4                                         A. Pre-Trial

¶ 5      On November 7, 2011, Jermaine Reynolds was found dead in a bedroom closet in an apartment belonging to defendant. The police subsequently took defendant into custody. The following month, a grand jury indicted him on three counts of first-degree murder, one count of armed robbery and one count of concealment of a homicidal death. Although defendant filed various pretrial motions, none of them are relevant for purposes of this postconviction appeal, and thus, we need not discuss them. Prior to trial, the State dismissed one of the counts of first-degree murder and the count of armed robbery.

¶ 6                                         B. Trial

¶ 7      The following recitation of evidence from defendant's trial is verbatim from the Rule 23 order that disposed of his direct appeal. See *People v. Harper*, 2019 IL App (1st) 162296-U. We are not including quotation marks for readability purposes.

¶ 8                                  1. The State's Case-in-Chief

¶ 9      In the State's case, the evidence showed that, in the beginning of November 2011, Robert Square, a friend of both defendant and Jermaine Reynolds, was staying at defendant's one-

bedroom apartment located on the 4000 block of South Lake Park Avenue in Chicago. During the evening of November 3, Square and defendant went to the house of Reynolds' long-time girlfriend, Lizabeth Henderson, to buy drugs from Reynolds. After buying drugs from Reynolds, Square returned to defendant's apartment. At some point that night, defendant, Reynolds and Square were all hanging out at defendant's apartment and watching a movie. Eventually, Square became tired and went to sleep in the bedroom on a bed, which is where defendant allowed him to sleep. According to Square, defendant preferred to sleep on a makeshift bed of pillows and blankets in front of the actual bed. That night the bedroom closet was open, and the closet had been open since Square had been staying at defendant's apartment.

¶ 10    The next day, around 10:30 a.m., as Square was leaving the apartment, he saw Reynolds coming back into the apartment with drugs. During that day, Henderson had been in contact with Reynolds and picked up her vehicle from him at defendant's apartment. Later in the day, Henderson talked to Reynolds on the phone.

¶ 11    According to Square, he returned to defendant's apartment a little after midnight on November 5. Defendant was there, but Reynolds was not. Square observed that defendant was acting "a little weird" and "getting mad" for no reason. Both of them used drugs, and eventually, Square decided to lay down in the bedroom. This time, he noticed that the closet was closed. Defendant, however, instructed Square to sleep in the living room instead, and Square complied. Meanwhile, during the day of November 5, Henderson was unable to get in contact with Reynolds, and other people she had talked to had not heard from him either. After 24 hours without contact, Henderson called the police to report Reynolds missing.

¶ 12    Two days later, an engineer at defendant's apartment building entered defendant's unit based on complaints of an odor in the apartment. As the engineer moved from the living room to

the bedroom, he noticed the odor getting stronger. The engineer opened the closet in the bedroom and observed a pile of clothes lying on the floor. He tapped the pile with his foot and felt something hard. He tapped again and suddenly, a jacket fell off the pile revealing the head of a human. The engineer called the management office, and someone there called the police.

¶ 13    After the police arrived at the apartment, Chicago Police Officer Joseph Scumaci, an evidence technician, observed Reynolds' dead body in the bedroom closet. With the help of other officers, Officer Scumaci processed the apartment for evidence. There was blood on various objects in the apartment, including a staple gun that was recovered next to the bedroom closet. Officers also recovered an "awl," an object with a metal point and wooden handle, a gold-colored horseshoe and a fake black revolver. After the evidentiary items were collected, they were tested. Testing revealed no latent fingerprint impressions on either the awl or staple gun, but did reveal blood on both objects. DNA analysis determined that the blood on both objects matched Reynolds and did not match defendant.

¶ 14    On August 8, 2011, Dr. Adrienne Segovia, an assistant medical examiner, performed an autopsy on Reynolds and concluded that his death was a homicide and caused by several sharp force injuries. Specifically, Dr. Segovia found 12 incised or sharp-cut wounds to various places on his head and body, 4 stab wounds to his head and neck, and 6 blunt force wounds to his head and body. Dr. Segovia also determined that Reynolds tested positive for Benzoylecgonine, ethanol, cocaine and morphine.

¶ 15    Within a couple days of Reynolds' body being discovered, the police placed defendant into custody and put him in an interview room at the police station. According to Chicago Police Detective Daniel Stanek, when the police interviewed any homicide suspect, they video and audio recorded the interview room so long as the suspect remained in custody. The recording of the

interview room would continue even if the suspect left the room for some reason, such as a bathroom break. The recording would only stop if a suspect's attorney entered the room.

¶ 16   When Detective Stanek first met defendant, he observed injuries to defendant's head and arms, and as a result, had an evidence technician photograph defendant and his injuries. Detective Stanek asked defendant about the injuries to his arms, and defendant told him that they had occurred the previous day. Later, while defendant was in the interview room, Detective Stanek along with Detective Scott Reiff questioned him about Reynolds' death. At trial, Detective Stanek did not recall asking defendant about his head injury and testified that defendant never indicated that the injuries had been caused by Reynolds.

¶ 17   Additionally at trial, Detective Stanek identified People's Group Exhibit No. 70 as seven DVDs which contained the unedited recording of defendant in the interview room. Detective Stanek also identified People's Exhibit No. 71 as a single DVD containing a portion of defendant's time in the interview room, in particular a portion of his and Detective Reiff's questioning of defendant. The State offered People's Exhibit No. 71 into evidence and played the DVD for the jury. The DVD contained approximately 20 minutes of Detectives Stanek and Reiff interviewing defendant on November 10, 2011, about Reynolds' death, spread over four distinct clips. Although the audio was difficult to hear occasionally, the following is what those clips depicted.

¶ 18   In the first clip, time stamped from 6:50 p.m. to 7:08 p.m., defendant informed the detectives that Reynolds would not give him back his "[debit] card" so the two exchanged "words" after which Reynolds hit him. The detectives insinuated that Reynolds had taken and used the card, apparently because defendant owed him money, a fact that defendant acknowledged. Defendant claimed it was only $40 as opposed to $600, which is what the detectives alleged. According to defendant, after Reynolds hit him, the two became involved in a "tussle" that got "out of hand"

where defendant punched Reynolds back. During the fight, defendant acknowledged "snapp[ing] out" and continuing to hit Reynolds using a "nail punch." The pair fought in various places in defendant's apartment, and the fight lasted several minutes. At some point during the fight, though defendant could not pinpoint exactly when, Reynolds pulled out a gun which defendant thought was real, and the two began wrestling over it. Eventually, defendant learned the gun was a toy, but "it was too late" according to him. When pressed by the detectives whether the gun was his, defendant denied it belonged to him.

¶ 19    According to defendant, eventually Reynolds stopped breathing, which caused defendant to "panic[]" and drag Reynolds' body to the bedroom closet, where he put clothes on top of the body. Defendant was adamant to the detectives that he did not want Reynolds to die. Defendant then left his apartment, but returned at some point. He thought about calling somebody, but was still panicked and did not know what to do. Later that night, Square came over to defendant's apartment. Defendant wanted to tell Square what happened, but he did not know what to say and did not tell Square anything. Square stayed the night, but slept in the living room. Defendant told the detectives that, the following day, he left his residence and did not stay there the rest of the weekend.

¶ 20    In the second clip, time stamped from 7:08 p.m. to 7:10 p.m., Detective Reiff confirmed with defendant that he and Reynolds were arguing about the debit card when Reynolds punched him. Detective Reiff also confirmed with defendant that he punched Reynolds back and the pair began "tussling." According to defendant, after fighting in the living room and hallway of the apartment, Reynolds fell to the ground. Because Reynolds kept moving and trying to get up, defendant grabbed a knife from the kitchen counter and hit Reynolds with it once in his face. Defendant admitted to the detectives that he "f*** up" and "lost it."

¶ 21    In the third clip, time stamped from 7:11 p.m. to 7:12 p.m., defendant acknowledged that he lied to the detectives when he said Reynolds had the gun. And in the final clip, time stamped from 7:13 p.m. to 7:14 p.m., defendant acknowledged putting clothes on top of Reynolds' body because he did not know what to do.

¶ 22    Detective Stanek further testified that, during the interview, defendant never informed him that Reynolds had the awl, staple gun or horseshoe in his hand. Detective Stanek added that, although defendant initially informed him that Reynolds had threatened defendant with a gun, defendant later admitted that the gun was fake and Reynolds never used it. According to Detective Stanek, throughout the interview, defendant only stated that Reynolds had hit him with his hands. Detective Stanek acknowledged that, although he requested forensic testing of the gold-colored horseshoe, he was unsure if it was actually tested.

¶ 23    At the conclusion of the State's case, it sought to admit all of its exhibits into evidence, including People's Group Exhibit No. 70. Defense counsel did not object to any of the exhibits' admission, and the trial court granted the State's request.

¶ 24                                    2. The Defense's Case

¶ 25    In the defense's case, defendant testified that, in November 2011, he had been recently laid off from a woodworking company where he had worked for seven years. At the time, he was receiving unemployment benefits, and the money would be deposited to a debit card every two weeks. That money was his primary source of income. Although defendant was familiar with Reynolds from around the neighborhood for several years, only in the year 2010 had they become friendly.

¶ 26    On November 3, 2011, Reynolds came over to defendant's apartment. The next day, around 6 p.m., defendant was looking around his apartment for his wallet that contained his debit card,

though he was relatively certain he had left it on the kitchen counter the previous night. Around this time, Reynolds returned to the apartment and sat down. Defendant could tell that Reynolds was under the influence of drugs and even observed Reynolds take part of a Methadone tablet and use heroin. Meanwhile, defendant continued to search for his wallet, but to no avail. Defendant then accused Reynolds of taking his wallet, though Reynolds denied it. Defendant told Reynolds that he was the only person at the apartment over the past day, and the pair subsequently "exchanged words." Defendant asked Reynolds to leave his apartment, and defendant told him that he would be contacting the police. Reynolds responded that, if he did, "the folks would be at you," which defendant interpreted as a threat. As defendant attempted to open the door of his apartment so Reynolds would leave, Reynolds took the keys in his hand and punched defendant in the face, using the metal carabiner key chain to make contact. Reynolds attempted to punch defendant again, but defendant tripped over a barstool and fell to the ground.

¶ 27    Defendant tried to get up, but Reynolds kept punching him in the head, still with the keys in his hand. Defendant was able to crawl over to a tool bag, grabbed an awl and hit Reynolds with it in the thigh area, which pushed Reynolds off of defendant. After defendant stood up, he attempted to retreat to the backdoor of his apartment to leave, but felt something in his back. The pair continued to fight into the hallway of defendant's apartment, where Reynolds tried hitting defendant with a staple gun while defendant fought back with the awl. Reynolds and defendant made their way back to defendant's bedroom, where the fighting persisted. In the bedroom, Reynolds grabbed a decorative horseshoe off a dresser and used it as they both continued to fight. After leaving the bedroom, the fighting continued down the hallway and into the kitchen and living room, where both men fell to the ground and began wrestling. As they were wrestling on the floor, defendant dropped the awl and things became "blurry" for him. At some point, defendant grabbed

a knife, and Reynolds bit defendant's hand. They also wrestled over the knife for a little bit, but eventually, the two became separated. When Reynolds attempted to attack defendant again, defendant hit him with the knife in the head.

¶ 28     Thereafter, because defendant was bleeding, he ran to the sink to put water on his face and he spit out a tooth. Defendant observed that Reynolds tried to get up, but could not, and eventually, Reynolds stopped moving. Defendant estimated the fight lasted between five and seven minutes. Defendant was in shock and did not call the police, but explained at trial that he did not know what to do and simply could not "absorb what had happened." Defendant eventually moved Reynolds' body to the bedroom "to try to figure out what to do." Defendant left his apartment and sat at a local park for a few minutes before returning to his apartment. Defendant left the apartment again and went to a friend's house, where he stayed for the weekend before being taken into custody by the police.

¶ 29     At trial, defendant testified that he believed his actions that day saved his life. He acknowledged that, when he was interviewed by the police, he initially lied to them by saying he had been robbed with a gun. Defendant further acknowledged not telling the police that Reynolds used keys, a staple gun or the horseshoe to attack him, but explained that the police never asked him what weapons Reynolds had used. Defendant identified several photographs of him taken at the police station that depicted various injuries to his head and body, which he asserted were from the fight with Reynolds. While defendant testified that he told the police those injuries were caused by Reynolds, he was not sure if it occurred on camera in the interview room, though he later testified that he only discussed the fight with the detectives while in the interview room. And, according to defendant, some of those discussions were not included in the video played for the

jury. Defendant also disputed much of the timeline of events testified to by Square during the State's case, in particular that Square had stayed at his apartment before the fight with Reynolds.

¶ 30                                3. The State's Rebuttal Case

¶ 31    In the State's rebuttal case, Detective Stanek testified that he did not have any conversations with defendant that were not recorded, defendant never stated that the injuries on his body were caused by Reynolds, and defendant never mentioned Reynolds using anything other than his fists.

¶ 32                                4. Jury Instructions Conference

¶ 33    During the jury instructions conference, defense counsel requested an instruction on self-defense, and instructions on second-degree murder based on both serious provocation and an unreasonable belief of self-defense. The trial court allowed the instruction on self-defense and an instruction on second-degree murder based on an unreasonable belief of self-defense, but denied an instruction on second-degree murder based on serious provocation.

¶ 34                        5. Closing Arguments, Jury Deliberations and Verdict

¶ 35    Following the parties' closing arguments, the jury began deliberating. After deliberations began, one of defendant's attorneys noted that, based on a pretrial motion *in limine*, the jury could not have access to the entire, unedited video of defendant's time in the interview room because there were instances of him harming himself. Defendant's other attorney volunteered to edit those actions out of the video. The trial court agreed with the plan, noted that the State could have one of its attorneys observe the editing and remarked that the jury may not even request the video evidence. But the court stated that, if the jury did, "we'll have it redacted."

¶ 36     It is unclear from the record what time the jury began deliberating, but at 3 p.m. on the same day the deliberations began, the jury sent out a note requesting the transcript of defendant's

trial testimony and the video evidence. At the time, defendant's attorney was still in the process of editing the video, and defendant's testimony had not yet been transcribed. The trial court believed it would be at least "a couple hours" until the transcript was ready. The court pondered having the court reporter "come over and read it to" the jury. But defendant's other attorney suggested that the court "just say the transcript is not available," which is how she had seen other trial courts respond in the past. The State agreed, and the court responded to the jury that the transcript was not available yet, the video would be available shortly and to continue deliberating.

¶ 37    At 4:05 p.m., the jury sent out another note. The jury asked if the transcript of defendant's entire testimony was not available, could it see just the portion of defendant's testimony where he discussed fighting with Reynolds in the kitchen and when defendant picked up the knife. As the parties discussed the note, the trial court pondered having the court reporter "read it back" to the jury, though the court did not want to overburden the court reporter, who had just worked late the previous night. The court also noted that simply telling the jury that it "heard the evidence" and to continue deliberating would be pointless. Defendant's attorney then suggested contacting the court reporter to determine how much longer it would be until the transcript of defendant's testimony would be ready and then formulate a response based on that answer. The State did not object, and the court assented to that suggestion. After speaking with the court reporter at 4:15 p.m., the court stated that she would have the transcript completed in 30 minutes. In turn, at 4:20 p.m., the court responded to the jury that the court reporter was in the process of transcribing defendant's testimony and it would be available in approximately 30 minutes. The court also informed the jury that it was providing the video evidence to them.

¶ 38    At 5:25 p.m., without having been given the transcript of defendant's trial testimony, the jury informed the trial court that it had reached verdicts. At 5:50 p.m., the court stated for the

record that the court reporter had still not yet completed the transcript. Ultimately, the jury found defendant guilty of first-degree murder and guilty of concealment of a homicidal death. Defense counsel requested that the jury be polled, and each juror confirmed his or her verdicts.

¶ 39                                    6. Posttrial and Sentencing

¶ 40    Defendant filed a motion for new trial, arguing, in part, that the trial court erred in denying his second-degree murder instruction based on serious provocation because it ignored the evidence of mutual combat. The court denied defendant's motion for new trial. Thereafter, it sentenced defendant to a total of 40 years' imprisonment, 35 years for murder and 5 years for concealment of a homicidal death, which by law had to be served consecutively. Defendant subsequently appealed.

¶ 41                                    7. Direct Appeal

¶ 42    On direct appeal, defendant contended that the trial court erred by refusing to provide the jury with an instruction on second-degree murder based on serious provocation, his trial counsel provided ineffective assistance because, even in the edited video evidence, there was instances of him harming himself that the jury could have seen, and his sentence was excessive. We found that the court did not err when it refused to give the jury a second-degree murder instruction based on serious provocation, his trial counsel did not provide ineffective assistance and his sentence was proper. Defendant lastly contended that his mittimus did not reflect the actual record in his case because it showed that he was convicted of two counts of first-degree murder where he was only convicted of one count of first-degree murder. Under Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), we remanded the matter to the trial court for purposes of allowing defendant to file a motion to correct his mittimus. As a result, in June 2019, in all other respects, we affirmed

defendant's convictions and sentences. Defendant subsequently filed a petition for leave to appeal to our supreme court, but, in September 2019, the court denied his petition.

¶ 43                                    8. Postconviction Proceedings

¶ 44    In October 2019, defendant filed a *pro se* petition under the Act (725 ILCS 5/122-1 *et seq.* (West 2018)), raising multiple alleged substantial deprivations of his constitutional rights. As relevant for this appeal, defendant claimed that his appellate counsel was ineffective for failing to argue that he was denied due process and deprived of a fair trial when the jury asked for the transcript of his trial testimony, but was not given the transcript within the time frame promised by the trial court. According to defendant, the jury's request made clear that it "wanted to compare and evaluate" what he said while being interrogated by the police with what he testified to at trial. Defendant asserted that the court should have "either stopped [the] jury's deliberations" until the transcript was available or at least waited to send the jury the video evidence until it also sent the transcript of his trial testimony. Defendant further argued that his trial counsel should have objected to the court's responses to the jury's notes. Defendant contended that, had his appellate counsel raised these issues on direct appeal, there was a reasonable probability that he would have been granted a new trial.

¶ 45    Two months later, the circuit court found the claims in defendant's petition frivolous and patently without merit. In relevant part, the court found there was nothing arbitrary or unreasonable about the trial court allowing the jury to continue deliberating while the transcript was being prepared. Moreover, the court observed that defendant's trial counsel attempted to obtain the transcript for the jury as soon as possible and that counsel could not have reasonably believed that the jury would have reached a verdict so soon after being told the transcript would be available in a few minutes. As such, the court found that appellate counsel did not arguably perform deficiently.

Additionally, the court found that defendant was not arguably prejudiced because it was pure speculation that the jury would have reached not guilty verdicts had they been provided with the transcript sooner. Consequently, the court concluded that defendant's ineffective assistance of appellate counsel claims were not arguably meritorious and dismissed his petition.

¶ 46   Defendant subsequently appealed.

¶ 47                               II. ANALYSIS

¶ 48   Defendant contends that the circuit court erred in dismissing his postconviction petition. Defendant asserts that, when the jury requested to review the transcript of his testimony, the trial court acknowledged the importance of his testimony. But despite this acknowledgement, defendant observes that the court provided the jury with the video of his statements to the police without the benefit of allowing the jury to also examine his trial testimony. According to defendant, the court erred by not suspending the jury's deliberations so that the jury could view both his statements to the police and his testimony at trial simultaneously. In turn, defendant posits that his appellate counsel should have raised the issue on direct appeal, and by not raising it, appellate counsel arguably provided ineffective assistance such that his petition should have survived first-stage review.

¶ 49   The Act provides a three-stage process for defendants who allege that they have suffered a substantial deprivation of their constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. This appeal only concerns the first stage, as this is the stage where the circuit court dismissed defendant's petition. At the first stage of proceedings under the Act, after the defendant files a petition, the circuit court must determine whether the petition states the gist of a constitutional claim, or is frivolous or patently without merit. *People v. Bailey*, 2017 IL 121450, ¶ 18; see also 725 ILCS 5/122-2.1(a)(2) (West 2018). At this stage, the court acts " 'strictly in an administrative

capacity by screening out those petitions which are without legal substance or are obviously without merit.' " *People v. Tate*, 2012 IL 112214, ¶ 9 (quoting *People v. Rivera*, 198 Ill. 2d 364, 373 (2001)). Because of this administrative role, the court is not permitted to make any credibility determinations or engage in any fact-finding endeavors. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). The petition's allegations of fact must be accepted as true as long as they are not affirmatively rebutted by the record. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47.

¶ 50     A petition may be deemed frivolous or patently without merit only where it has no arguable basis in either law or fact, meaning the petition relies "on 'an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)). At the first stage of proceedings, a *pro se* petition should be construed liberally, meaning a "borderline" petition should be allowed to proceed. *Thomas*, 2014 IL App (2d) 121001, ¶ 48. We review the circuit court's first-stage dismissal *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 51     To succeed on a claim of ineffective assistance of appellate counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Golden*, 229 Ill. 2d 277, 283 (2008). Under the *Strickland* test, the defendant has to establish that it is arguable his appellate counsel's performance fell below an objective standard of reasonableness and it is arguable there is a reasonable probability that the result of his appeal would have been different absent appellate counsel's allegedly deficient performance. *Id.* Because the defendant has the burden to prove both prongs of the *Strickland* test, we may examine them in either order. *Strickland*, 466 U.S. at 697. Appellate counsel is not required to brief every possible issue on appeal. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). "[I]t is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's

appraisal of the merits is patently wrong." *Id.* To this end, in order to determine whether appellate counsel was ineffective, we must examine the merits of the underlying issue because the "defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal." *Id.*

¶ 52     As an added wrinkle, when the trial court responded to the jury's various notes, defendant's attorney did not object. In fact, after the first note, it was defendant's attorney who suggested the court inform the jury that the transcript was not available, which is how the court ultimately proceeded. Arguably, this could be a basis for invited error. Under the invited-error doctrine, "a party cannot complain of error that it brought about or participated in." *People v. Hughes*, 2015 IL 117242, ¶ 33. "When a defendant acquiesces in the trial court's answer to a question from the jury, the defendant cannot later complain that the trial court's answer was" erroneous. *People v. Averett*, 237 Ill. 2d 1, 23-24 (2010). If defendant, through his attorney, invited the error, appellate counsel would have been precluded from meritoriously raising an argument on direct appeal about the trial court's actions. See *People v. Carter*, 208 Ill. 2d 309, 319 (2003) ("Action taken at defendant's request precludes defendant from raising such course of conduct as error on appeal."). Despite this, we will give defendant the benefit of the doubt because, in response to the jury's second note, defendant's attorney did not invite the error. She did, however, fail to object to the court's response and never requested the court suspend deliberations. Similarly, defendant never raised any argument about the court's actions in response to the jury's notes in his posttrial motion, meaning on direct appeal, any argument over the court's actions would have been forfeited. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion.")

¶ 53    To overcome this forfeiture on direct appeal, defendant would have had to rely on the plain-error doctrine. Under the plain-error doctrine, we may review an unpreserved claim of error when there was a clear or obvious error and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* The first step under the doctrine would have been to determine whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 54    In turn, we must examine the underlying issue of whether the trial court's actions in response to the jury notes were clear or obvious errors. "Transcripts of testimony may be shown to the jury if the jury so requests and if the trial court, in its discretion, considers the transcripts will be helpful." *People v. Flores*, 128 Ill. 2d 66, 93 (1989). Thus, as a general matter, the court has broad discretion to grant or deny the jury's request to review trial transcripts. *People v. Williams,* 173 Ill. 2d 48, 87 (1996). Though, when the jury requests trial transcripts, the court "must assume that the jury believes that such review would be helpful." *People v. Modrowski*, 296 Ill. App. 3d 735, 747 (1998).

¶ 55    In this case, the trial court believed the jury's review of the transcript of defendant's trial testimony would be helpful. Indeed, the court diligently attempted to provide the jury the transcript; it simply was not ready yet. To this end, defendant posits that the court should have suspended deliberations while the court reporter finished transcribing defendant's trial testimony so that the jury could have reviewed the transcript simultaneously with his statements to the police, as shown in the video evidence. "[A] court may, after submission of the case to the jury, suspend deliberations." *People v. Hollahan*, 2020 IL 125091, ¶ 25. " '[J]ury deliberation' is not some

uncontrollable chain reaction *** that, once set in motion, is beyond the power of the trial court to suspend, control, and circumscribe as the court reasonably sees fit in the exercise of its discretion." *Id.* An abuse of discretion occurs only when the court's decision was fanciful, arbitrary or so unreasonable that no reasonable person would adopt the same view. *People v. King*, 2020 IL 123926, ¶ 35.

¶ 56    In this case, the trial court's actions were eminently reasonable. After the jury's first request, with the agreement of the State and one of defendant's attorneys, the court told the jury the transcript was not available yet, the video evidence would be available shortly and to continue deliberating. See *People v. Olinger*, 112 Ill. 2d 324, 349 (1986) (finding the trial court did not abuse its discretion in response to the jury's request to see trial transcripts by saying " 'the transcripts are not available,' " the jurors " 'must rely on [their] memories' " and instructing them to continue deliberating). Once the jury's second note indicated that it wanted to review only a portion of defendant's trial testimony, the court acted assiduously in contacting the court reporter to find out when the transcript would be ready. The court reporter informed the court that it would be available in 30 minutes. Consistent with this assurance, the court told the jury the transcript would be available in 30 minutes and provided the jury with the video evidence of defendant's statements to the police. Approximately an hour later, the jury returned its guilty verdicts. Given the court had just provided the video evidence to the jury and its assertion that the transcript of defendant's trial testimony would be ready very soon, the court could not have had the clairvoyance to foresee that the jury would then return guilty verdicts less than an hour later absent reviewing the transcript. See *People v. McCurry*, 2011 IL App (1st) 093411, ¶ 24 (observing that we cannot expect the trial court to have "clairvoyant capabilities").

¶ 57    Although the trial court could have utilized its discretion and suspended the jury's deliberations until the transcript was available (see *Hollahan*, 2020 IL 125091, ¶ 25), its failure to do so was not unreasonable given that the trial evidence was presented the day before the jury began and completed deliberations. See *People v. Franklin*, 135 Ill. 2d 78, 105 (1990) (finding the trial court did not abuse its discretion in denying the jury's request to review transcripts of trial testimony, in part, because "the testimony was still fresh in the jurors' minds, as they heard it the previous day"); *People v. Fisher*, 281 Ill. App. 3d 395, 405-06 (1996) (finding the trial court would not have abused its discretion in denying the jury's request to review trial transcripts because the trial lasted only four days, the jury reached a verdict on the fourth day and therefore, "there was no appreciable delay in the proceedings, nor did the jury deliberate for a great length of time such that the testimony may have grown stale"). In all, the court did not act unreasonably in responding to the jury's notes and allowing the jury to continue deliberating while the court reporter finished transcribing defendant's trial testimony.

¶ 58    Nevertheless, in arguing that the trial court did abuse its discretion in responding to the jury's notes, defendant relies on *People v. Queen*, 56 Ill. 2d 560 (1974) and *People v. Davis*, 105 Ill. App. 3d 549 (1982). In *Queen*, 56 Ill. 2d at 565, during the jury's deliberations, it requested to review the defendant's trial testimony. The trial court, however, responded that it did not have discretion to consider the request. *Id.* Ultimately, our supreme court found that the trial court's failure to consider the jury's request "was of such substance that the cause must be remanded for a new trial" and "the defendant was entitled to have the request considered by the trial court." *Id.* at 565-66. In *Davis*, 105 Ill. App. 3d at 554-55, during the jury's deliberations, it informed the bailiff of its desire to see a transcript of a certain portion of the trial. The bailiff, however, refused to inform the trial court of the request. *Id.* at 555. And because the trial court was responsible for

the actions of its bailiff, the appellate court found that the trial court, in essence, refused to exercise its discretion in considering the jury's request, which was an abuse of discretion. *Id.* The appellate court further observed that, "[e]ven in a case in which the evidence is overwhelming it is the duty of the court to furnish the jury with testimony, if it may be done without undue hardship." *Id.* at 556. In the instant case, in stark contrast to *Queen* and *Davis*, the trial court exercised its discretion to essentially grant the jury's request to see the transcript but it could not immediately provide the transcript given that the court reporter had not finished transcribing defendant's testimony.

¶ 59    Lastly, defendant posits that his case is analogous to the Third Circuit Court of Appeals decision in *United States v. Jackson*, 257 F.2d 41 (3d Cir. 1958). Initially, we note that decisions from lower federal courts are not binding on this court but merely persuasive authority. See *People v. Stansberry*, 47 Ill. 2d 541, 545 (1971). Nonetheless, in *Jackson*, the defendant was charged with various narcotics-related offenses and some of the critical trial evidence was based on the testimony of a government informant. *Jackson*, 257 F.2d at 42. During the trial, the defendant raised the defense of entrapment. *Id.* at 43. During deliberations, the jury asked the trial court whether the informant was a government employee. *Id.* at 42. The court "doubted [its] power to comment on the evidence as to this matter" but, regardless, "did not remember" and thus, told the jury to resume its deliberations without answering the question. *Id.* After the court sent the jury back to resume deliberations, the parties' attorneys and the court continued discussing the note. *Id.* at 42-43. Ultimately, the court decided that it would read the portion of the trial transcript discussing the informant's role to the jury, which did, in fact, show that the government paid the informant. *Id.* at 43. By the time the court made that decision, however, the jury came back with a guilty verdict. *Id.* When the court asked the foreman of the jury about its need for an answer to the question, the foreman asserted that it no longer needed an answer. *Id.*

¶ 60    On appeal, the Third Circuit Court of Appeals observed that the trial court "had just explained what entrapment was and on the matter of entrapment the question whether [the informant] was a government employee was certainly something to be considered." *Id.* Because the question was "highly relevant" to the issues of the case, the Third Circuit Court of Appeals found the trial court's "failure to permit the reading of the relevant testimony at a time when it would have been useful in the jury's deliberations created unfairness to the defendant." *Id.* Although the Third Circuit Court of Appeals acknowledged that such decisions are generally left to the discretion of the trial court, "in this particular situation *** the defendant was entitled to have the jury informed as a matter of right." *Id.* As such, the Third Circuit Court of Appeals reversed the defendant's guilty verdict. *Id.* at 44.

¶ 61    In the instant case, in contrast to *Jackson*, defendant was not entitled to any particular action by the trial court as a matter of right, as both the decision of whether to provide a transcript to the jury and whether to suspend deliberations were, based on our well-established case law, within the court's discretion. Furthermore, in *Jackson*, the jury's question sought an answer that had legal significance to the defendant's entrapment defense, whereas, in the instant case, an answer to the jury's question did not have legal significance. Rather, the jury's question merely indicated its desire to review portions of defendant's trial testimony.

¶ 62    In sum, in this case, the trial court did not abuse its discretion when it allowed the jury to continue deliberating, rather than suspend deliberations, while the court reporter finished transcribing defendant's trial testimony. Because the court did not commit clear or obvious errors in responding to the jury's notes, there would have been no plain error. See *People v. Sims*, 192 Ill. 2d 592, 628 (2000). Having found that no plain error occurred below, the underlying issue had no merit and defendant cannot show arguable prejudice from his appellate counsel's failure to

argue this issue on direct appeal. See *People v. Enis*, 194 Ill. 2d 361, 382 (2000) ("Because the underlying issue has no merit, defendant has suffered no prejudice due to appellate counsel's failure to raise this issue on direct appeal."). Consequently, defendant's appellate counsel was not arguably ineffective.

¶ 63    In the alternative, defendant contends that his appellate counsel was arguably ineffective for not raising a claim that his trial counsel was ineffective when trial counsel failed to request a suspension of the jury's deliberations while the transcript was being completed or failed to object to the court only providing the jury with the video evidence.

¶ 64    To succeed on a claim of ineffective assistance of trial counsel, like a claim of ineffective assistance of appellate counsel, the defendant must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. 668. And so, the defendant must show that his counsel performed deficiently and his counsel's deficient performance prejudiced him. *People v. Domagala*, 2013 IL 113688, ¶ 36. Like with defendant's first claim of ineffective assistance of appellate counsel, for this alternative claim to have succeeded, defendant had to show that the underlying issue has merit. *Simms*, 192 Ill. 2d at 362.

¶ 65    Here, defendant fails to do so because he relies on complete speculation that the jury would have reached different verdicts had counsel requested the court suspend deliberations or objected to providing the jury with only the video evidence. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."); *People v. Palmer*, 162 Ill. 2d 465, 481 (1994) ("Proof of prejudice" for an ineffective assistance of counsel claim "cannot be based on mere conjecture or speculation as to outcome.") Given the speculation involved in demonstrating the prejudice component of trial counsel's alleged ineffectiveness,

the underlying issue had no merit and defendant cannot show arguable prejudice from his appellate counsel's failure to argue this issue on direct appeal. See *Enis*, 194 Ill. 2d at 382. Consequently, defendant's appellate counsel was not arguably ineffective.

¶ 66                                          III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 68    Affirmed.